FILED
United States Court of Appeals
Tenth Circuit

July 3, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

WILLIAM HATCH,

        Defendant-Appellant.

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

THIRTEENTH AMENDMENT
SCHOLARS,

        Amicus Curiae.

No. 12-2040

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 1:10-CR-03104-BB-2)**

---

Richard A. Winterbottom, Assistant Federal Public Defender, Albuquerque, New Mexico, for Appellant.

Thomas E. Chandler, Attorney, Civil Rights Division (Thomas E. Perez, Assistant Attorney General, and Jessica Dunsay Silver, Attorney, Civil Rights Division, with him on the brief) Department of Justice, Appellate Section, Washington, District of Columbia, for Appellee.

George Bach, Counsel of Record, and Dawinder S. Sidhu, University of New Mexico School of Law, William M. Carter, Jr., Pittsburgh, Pennsylvania, Alexander Tsesis, Chicago, Illinois, and Rebecca E. Zietlow, Toledo, Ohio on the

brief for Amicus Curiae.

Before **MURPHY**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Three New Mexico men kidnaped a disabled Navajo man and branded a swastika into his arm. The United States charged the assailants with committing a hate crime under the recently enacted Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, Pub. L. No. 111-84, Div. E, 123 Stat. 2835 (2009), *codified in relevant part at* 18 U.S.C. § 249. As relevant here, the Hate Crimes Act makes it a felony to physically attack a person because of that person's race.

The three assailants contended in district court that the Hate Crimes Act is unconstitutional, claiming Congress lacks the authority to criminalize purely intrastate conduct of this character. The government countered that the Thirteenth Amendment, which abolished slavery in the United States, gave Congress the necessary authority. The district court agreed with the government, holding that Congress's power to enforce the Thirteenth Amendment authorized it to enact 18 U.S.C. § 249(a)(1), the portion of the Hate Crimes Act under which the three men were charged.

One of those men, William Hatch, then pleaded guilty while reserving his right to appeal. He now renews his challenge to the constitutionality of the Act.

Like the district court, we conclude that Congress has power under the Thirteenth Amendment to enact § 249(a)(1). Although the Thirteenth Amendment by its terms applies to slavery and involuntary servitude, Supreme Court precedent confirms Congress's authority to legislate against slavery's "badges and incidents" as well. In particular, the Supreme Court held in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968)—a case permitting a federal private right of action against private individuals for housing discrimination—that Congress itself has power to determine those badges and incidents.

Section 249(a)(1) rests on the notion that a violent attack on an individual because of his or her race is a badge or incident of slavery. Congress reached this conclusion by accounting for the meaning of "race" when the Thirteenth Amendment was adopted, the state of mind of the attacker, and the attack itself. By so doing, and under the authority of *Jones*, we conclude Congress rationally determined that racially motivated violence is a badge or incident of slavery against which it may legislate through its power to enforce the Thirteenth Amendment.

We therefore affirm.

## I.  Background

Hatch and two of his friends, Paul Beebe and Jesse Sanford, worked together at a restaurant in Farmington, New Mexico. All three are white.

In April 2010, a mentally disabled Navajo man—whom the record identifies only as "V.K."—came to the restaurant. Beebe convinced V.K. to come to Beebe's apartment. Hatch and Sanford later joined Beebe there.

At Beebe's apartment, the three white men drew on V.K.'s back with markers. They told him they would draw "feathers" and "native pride" but actually drew satanic and anti-homosexual images. They then shaved a swastika-shaped patch into V.K.'s hair. Finally, they heated a wire hanger on the stove and used it to brand a swastika into V.K.'s arm.

Based on these actions, the State of New Mexico charged Beebe, Sanford, and Hatch under state law with kidnaping, aggravated battery, and conspiracy to commit both of these crimes.

Six months later—while the state prosecution was still pending—the federal government charged Beebe, Sanford, and Hatch with violating (and conspiracy to violate) 18 U.S.C. § 249(a)(1), a portion of the Hate Crimes Act making it unlawful to subject a person to physical violence on account of the person's race.

In May 2011, Hatch was convicted in New Mexico state court of conspiracy to commit aggravated battery, but otherwise acquitted. That same month, Beebe, Sanford, and Hatch filed a motion in federal court to dismiss the federal indictment, claiming that 18 U.S.C. § 249(a)(1) is unconstitutional. The district court rejected that argument in a thorough opinion. *United States v. Beebe*, 807

F. Supp. 2d 1045 (D.N.M. 2011).  Hatch then entered a conditional guilty plea on the federal conspiracy charge, preserving his right to appeal the constitutional question.

In September 2011, the State of New Mexico sentenced Hatch to eighteen months' imprisonment.  In February 2012, the district court sentenced Hatch to the lesser of fourteen months' imprisonment or time served, running concurrently with his state sentence.

## II.  Analysis

The sole question before us is whether the portion of the Hate Crimes Act under which Hatch was convicted, 18 U.S.C. § 249(a)(1), is a constitutional exercise of Congress's power to enforce the Thirteenth Amendment.  We review challenges to the constitutionality of a statute de novo.  *United States v. Carel*, 668 F.3d 1211, 1216 (10th Cir. 2011), *cert. denied*, 132 S. Ct. 2122 (2012).

### A.  *The Thirteenth Amendment Enforcement Power*

Although this case centers on the Thirteenth Amendment, some of Hatch's arguments rely on cases arising under the other two Reconstruction Amendments —the Fourteenth and Fifteenth Amendments.  We therefore begin with a brief description of all three Reconstruction Amendments, and then turn to our analysis of the Thirteenth Amendment and the Hate Crimes Act specifically.

### *1. The Reconstruction Amendments*

The Thirteenth Amendment prohibits slavery and involuntary servitude, while extending power to Congress to enforce its provisions:

> Section 1.  Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

> Section 2.  Congress shall have power to enforce this article by appropriate legislation.

Congress approved the Thirteenth Amendment in January 1865 as the Civil War drew to a close.  With the Confederacy's surrender and President Lincoln's assassination the following April, twenty-seven states ratified the amendment by December 1865 and it came into force that same month.

Two other amendments soon followed, forming a trilogy referred to as the Reconstruction Amendments.  The Fourteenth Amendment resulted in part from lingering doubts that the Thirteenth Amendment authorized civil rights legislation enacted under its auspices.  *See* Jennifer Mason McAward, *The Scope of Congress's Thirteenth Amendment Enforcement Power After* City of Boerne v. Flores, 88 Wash. U. L. Rev. 77, 115–16 (2010) ("McAward, *Enforcement Power*").  Congress accordingly proposed the Fourteenth Amendment, which the states adopted in 1868.  As is well known, the Fourteenth Amendment protects persons against various state-sponsored intrusions and discriminations.  It also contains an enforcement clause similar to Section 2 of the Thirteenth Amendment:

"The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5.

The states adopted the third of the Reconstruction Amendments, the Fifteenth Amendment, in 1870. In addition to guaranteeing the right to vote regardless of "race, color, or previous condition of servitude," U.S. Const. amend. XV, § 1, the Fifteenth Amendment contains an enforcement provision similar to those found in the Thirteenth and Fourteenth Amendments: "The Congress shall have power to enforce this article by appropriate legislation," *id*. § 2.

### 2. The "Badges and Incidents" of Slavery

At issue here is the first of the Reconstruction Amendments, the Thirteenth. On its face, it appears simply to abolish slavery and give Congress power to enforce that abolition. The Supreme Court soon clarified, however, that Congress's enforcement power under Section 2 also extends to eradicating slavery's lingering effects, or at least some of them.

In 1875, Congress acted under both the Thirteenth and Fourteenth Amendments to pass what was knows as the Civil Rights Act. That act aimed to guarantee "[t]hat all persons within the jurisdiction of the United States shall be entitled to the full and equal enjoyment of" public facilities such as inns, theaters, and rail cars, "subject only to . . . conditions and limitations . . . applicable alike to citizens of every race and color." 18 Stat. 336. Any person refusing to abide

by this guarantee, including private citizens, could be guilty of a misdemeanor.
*Id*.

In 1883, five cases arising under this act came to the Supreme Court in an appeal consolidated as the *Civil Rights Cases*. All five involved private citizens or entities denying African Americans access to public accommodations on equal terms with other races. *Civil Rights Cases*, 109 U.S. 3, 4 (1883).

"Has Congress constitutional power to make such a law?" the Supreme Court inquired. *Id*. at 10. The Court could find no such power under the Fourteenth Amendment, given that it restricts state action rather than private action. *Id*. at 10–19. The Court then turned to the Thirteenth Amendment. That Amendment as an original matter had a broader focus, and was "not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *Id*. at 20. Beyond simply "nullifying all state laws which establish or uphold slavery," the Court reasoned that the Thirteenth Amendment

> has a reflex character also, establishing and decreeing universal civil and political freedom throughout the United States; and it is assumed that the power vested in Congress to enforce the article by appropriate legislation, clothes Congress with power to pass all laws necessary and proper for abolishing all *badges and incidents of slavery* in the United States . . . .

*Id*. (emphasis added).

But "[c]an the act of a mere individual, the owner of the inn, the public conveyance, or place of amusement, refusing the accommodation, be justly regarded as imposing any badge of slavery or servitude upon the applicant . . . ?" *Id*. at 24. The Court answered no:

> There were thousands of free colored people in this country before the abolition of slavery, enjoying all the essential rights of life, liberty, and property the same as white citizens; yet no one, at that time, thought that it was any invasion of their personal *status* as freemen because they were not admitted to all the privileges enjoyed by white citizens, or because they were subjected to discriminations in the enjoyment of accommodations in inns, public conveyances, and places of amusement. Mere discriminations on account of race or color were not regarded as badges of slavery.

*Id*. at 25 (emphasis in original). With this reasoning, the Court struck down the Civil Rights Act as unconstitutional.

Historically speaking, it bears noting that the contemporaneous meaning of "incidents of slavery," both before and soon after the adoption of the Thirteenth Amendment, generally referred to the legal restrictions placed on slaves, as well as slaveowners' legal rights toward their slaves. *See* George Rutherglen, *The Badges and Incidents of Slavery and the Power of Congress to Enforce the Thirteenth Amendment*, in *The Promises of Liberty: The History and Contemporary Relevance of the Thirteenth Amendment* 163, 164–65 (Alexander Tsesis ed., 2010) ("Rutherglen, *Badges and Incidents*"); Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery*, 14 U. Pa. J. Const. L.

561, 570–75 (2012) ("McAward, *Defining the Badges*"). As is well known, slaves could not own property, could not enter into contracts, and so forth. Slaveowners, by contrast, had complete control over their slaves and even their slaves' children. These aspects of slavery, as well as the so-called Black Codes that attempted to perpetuate the master/slave relationship as much as possible after emancipation, are what were then considered to be "incidents of slavery." *See id.*

"Badges of slavery," by contrast, had a somewhat looser meaning. *See id.* at 575–82. In the antebellum years, it could refer literally to a badge worn by slaves, such as copper badges issued to certain slaves in Charleston, South Carolina. *See generally* Harlan Greene et al., *Slave Badges and the Slave-Hire System in Charleston, South Carolina 1783–1865* (2008); Rutherglen, *Badges and Incidents*, at 166 (noting that "badge," in antebellum legal discourse, was sometimes used as shorthand for "evidence permitting an inference from external appearances to legal status"). In addition, "badges of slavery" could refer to the psychological scars that slavery inflicted upon slaves, McAward, *Defining the Badges*, at 577, or to any "evidence of political subjugation," Rutherglen, *Badges and Incidents*, at 166.

In postbellum legal discourse, "badges of slavery" came to be used primarily as a synonym for slavery's continuing "incidents," as perpetuated by the Black Codes. McAward, *Defining the Badges*, at 581; Rutherglen, *Badges and Incidents*, at 165. But "badges of slavery" also arguably extended to "widespread

[private] violence and discrimination, disparate enforcement of racially neutral laws, and eventually, Jim Crow laws." McAward, *Defining the Badges*, at 581.

Whatever "badges of slavery" and "incidents of slavery" meant in isolation, the compound phrase, "badges and incidents of slavery," first arose in the *Civil Rights Cases* and "quickly became the Supreme Court's standard gloss upon the powers of Congress under the Thirteenth Amendment." Rutherglen, *Badges and Incidents*, at 172. In other words, it is not clear the Supreme Court in the *Civil Rights Cases* intended "badges and incidents of slavery" as a reference to the phrase's component parts as contemporarily understood. It was, rather, "a new characterization of Congress's power." McAward, *Defining the Badges*, at 583.

The *Civil Rights Cases* obviously interpreted this characterization narrowly. Following this narrow reading of what constitutes the badges and incidents of slavery, the Supreme Court later held that Congress's badges-and-incidents authority did not permit it to criminalize threats of violence used to deter black persons from obtaining gainful employment. *Hodges v. United States*, 203 U.S. 1 (1906). Even if "one of the disabilities of slavery, one of the *indicia* of its existence, was a lack of power to make or perform [employment] contracts," *id*. at 17 (emphasis in original), the Court believed that permitting Congress to criminalize threats of violence used to deter blacks from obtaining employment would permit Congress to legislate against nearly every wrong committed by one person against another, *see id*. at 18–19. This was so, said the Court, because the

-11-

Thirteenth Amendment extends its protections to all races, not just formerly enslaved races. *Id*. at 16–17.

In other words, the Court in *Hodges* reasoned that if badges-and-incidents extends to the type of conduct at issue there *and* if Congress's badges-and-incidents authority applies to all races, then Congress could legislate against "every act done to an individual which was wrong if done to a free man, and yet justified in a condition of slavery." *Id*. at 19. The Court gave no weight to the element that distinguished a civil rights offense from an ordinary offense, namely, that the defendant acted because of the victim's race. *See id*. at 18 (quoting government's concession that the statute's constitutionality hung on "the additional element . . . of an injury [inflicted] solely on account of [the victim's] color"); *cf. id*. at 26, 29–30, 34–37 (Harlan, J., dissenting) (repeatedly pointing out the requirement that the defendant act "because of" the victim's race).

Sixty years after *Hodges*, however, the Court adopted a more generous approach to Congress's Thirteenth Amendment enforcement power, giving Congress relatively wide latitude both to determine what qualifies as a badge or incident of slavery and how to legislate against it. In *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), a black prospective home buyer was turned away because the sellers refused to sell "for the sole reason that [plaintiff] [was] a Negro." *Id*. at 412. The plaintiff sued under 42 U.S.C. § 1982, which declares that "[a]ll citizens of the United States shall have the same right, in every State

and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Echoing the *Civil Rights Cases*, the seller countered that § 1982 must be unconstitutional to the extent it applies to purely private conduct, rather than state action.

The Supreme Court disagreed. It concluded that Congress had enacted § 1982 under its "power to enforce [the Thirteenth Amendment] by appropriate legislation." *Jones*, 392 U.S. at 437–40. Given that the Thirteenth Amendment contains no language limiting its effect to government-caused or -supported conduct (unlike the Fourteenth Amendment), the Supreme Court held that Congress could apply § 1982 to private conduct, and that it intended to do so. *Id*. at 429–36.

As to the question of whether Section 2 of the Thirteenth Amendment authorized legislation such as § 1982, the Court returned to the badges-and-incidents language derived from the *Civil Rights Cases*. But far from the constricted view taken in the *Civil Rights Cases* (and *Hodges*), the Court emphasized a statement from one of the amendment's sponsors, Senator Trumbull of Illinois, declaring that "it is for Congress to adopt such appropriate legislation as it may think proper, so that it be a means to accomplish the end." *Id*. at 440 (citing Cong. Globe, 39th Cong., 1st Sess., 322).

"Surely Senator Trumbull was right," the Court concluded. "Surely Congress has the power under the Thirteenth Amendment rationally to determine

what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Id.* As to § 1982 specifically, the Court could not "say that the determination Congress has made is an irrational one" given that restrictions on property ownership and alienability were indisputably a badge or incident of slavery. *Id.* at 440–41. Applying this rational determination standard, the Court upheld § 1982 as a constitutional expression of congressional power and overruled *Hodges* on this point. *Id.* at 441 n.78.

In sum, after these cases the Thirteenth Amendment can be seen as treating most forms of racial discrimination as badges and incidents of slavery, and that Congress not only has the power to *enforce* the amendment, but also to a certain extent to define its *meaning*. That brings us to the Hate Crimes Act.

**B. *The Hate Crimes Act***

Relying in part on the badges-and-incidents authority described in *Jones*, Congress enacted the Hate Crimes Act in 2009, adding a new § 249 to Title 18. Section 249 defines two separate offenses.

The first offense prohibits physical violence (or threats of it in certain circumstances) on account of the victim's race, color, religion, or national origin:

> **(1) Offenses involving actual or perceived race, color, religion, or national origin.**—Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any

> person, because of the actual or perceived race, color, religion, or national origin of any person—
>
>> **(A)** shall be imprisoned not more than 10 years, fined in accordance with this title, or both . . . .

18 U.S.C. § 249(a)(1).  We refer to this as the "racial violence provision."  This is the portion of the Act under which Hatch was charged and convicted.

Congress explicitly justified the racial violence provision under its Thirteenth Amendment badges-and-incidents authority:

> For generations, the institutions of slavery and involuntary servitude were defined by the race, color, and ancestry of those held in bondage.  Slavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment to the Constitution of the United States, through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry.  Accordingly, eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude.

*Id*. note (reprinting Pub. L. No. 111-84, § 4702(7) (2009)).

The second offense defined in § 249 has a similar character, but protects more broadly against violence on account of religion, national origin, gender, sexual orientation, gender identity, or disability.  It also requires the government to prove a connection to interstate commerce or that the offense occurred in a federal territory:

-15-

**(2) Offenses involving actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability.—**

**(A) In general.**—Whoever, whether or not acting under color of law, in any circumstance described in subparagraph (B) [regarding interstate commerce] or paragraph (3) [regarding federal territories], willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person—

**(i)** shall be imprisoned not more than 10 years, fined in accordance with this title, or both . . . .

*Id*. § 249(a)(2).

That provision is not before us in this appeal.

### C. Constitutionality of 18 U.S.C. § 249(a)(1)

The racial violence provision's constitutionality turns on the scope of Congress's authority to prohibit racial violence as a badge or incident of slavery. In this regard, as we explained above, the Supreme Court's *Jones* decision establishes a "rational determination" test. As the Court there stated, "Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." 392 U.S. at 440. Thus, under *Jones*, if Congress rationally determines that something is a badge or incident of

slavery, it may broadly legislate against it through Section 2 of the Thirteenth Amendment.

Hatch argues, however, that Congress's badges-and-incidents authority has grown substantially narrower in the past few decades. Hatch specifically relies on a synthesis of federalism concepts derived from the Tenth Amendment and post-*Jones* Supreme Court decisions regarding Congress's powers under the Commerce Clause and Section 5 of the Fourteenth Amendment. Hatch believes these authorities demonstrate that the racial violence provision is an example of Congressional overreach—an impermissible intrusion into matters the Constitution reserves to the states.

While Hatch's arguments raise important federalism questions, in light of *Jones* it will be up to the Supreme Court to choose whether to extend its more recent federalism cases to the Thirteenth Amendment. In addition, the racial violence provision displays limiting principles that are arguably more confining than *Jones* itself contemplated. Thus, we need not decide the outer limits of *Jones*'s rational determination standard because the racial violence provision can be seen in a much narrower light.

### 1. Federalism Concerns

Hatch's federalism arguments begin with the Tenth Amendment: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." According

to Hatch, the Tenth Amendment dictates that "Thirteenth Amendment legislation is not 'appropriate' if it fails to accommodate the state police power." Aplt. Br. at 24.

The Tenth Amendment certainly highlights the structural significance of federalism in our constitutional system. But when the Constitution explicitly grants Congress authority to act, the Tenth Amendment gives way: "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . . ." *New York v. United States*, 505 U.S. 144, 156 (1992). The Thirteenth Amendment, enacted after the Tenth Amendment, explicitly gives Congress power to enforce its prohibitions. No party has cited, nor could we find, any authority stating that the Tenth Amendment nonetheless imposes limits on Congress's Thirteenth Amendment powers.

But because the three Reconstruction Amendments "disclose[] a unity of purpose," *Slaughter-House Cases*, 83 U.S. 36, 67 (1872), Hatch proposes that a Fourteenth Amendment case—*City of Boerne v. Flores*, 521 U.S. 507 (1997)—demonstrates certain limits. *City of Boerne* evaluated the constitutionality of the Religious Freedom Restoration Act (RFRA), which was Congress's attempt to legislatively overrule *Employment Division v. Smith*, 494 U.S. 872 (1990). *Smith* had abrogated much of the Supreme Court's earlier jurisprudence regarding whether a neutral law of general application nonetheless impermissibly burdened

a person's First Amendment right to free exercise of religion. The pre-*Smith* test required the government to demonstrate compelling need to apply such a law to a religious objector. *Id*. at 882–84. *Smith* eliminated that requirement on the theory that a neutral law of general application raises no free exercise concerns, even if it burdens a religious objector's ability to worship. *Id*. at 878–80.

Congress responded to *Smith* by enacting RFRA, which re-imposed a stricter standard on the states—in effect, returning to the pre-*Smith* understanding of the First and Fourteenth Amendments. Congress justified RFRA as "appropriate legislation" under Section 5 of the Fourteenth Amendment, which provides (similar to Section 2 of the Thirteenth Amendment) that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." The Supreme Court, however, held that Congress had in fact attempted to amend the Constitution legislatively . *City of Boerne*, 521 U.S. at 532. The Court acknowledged that Section 5 of the Fourteenth Amendment gives Congress important powers, but "[i]f Congress could define its [Section 5] powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be superior paramount law, unchangeable by ordinary means." *Id*. at 529 (internal quotation marks omitted).

The Court further insisted on "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id*. at 520. The Court found an example of congruence and proportionality in *South*

*Carolina v. Katzenbach*, 383 U.S. 301 (1966), which addressed the

constitutionality of the Voting Rights Act of 1965 under Section 2 of the Fifteenth

Amendment.  That section states: "The Congress shall have power to enforce this

article by appropriate legislation."  Although *South Carolina v. Katzenbach* was a

Fifteenth Amendment case, *City of Boerne* found it instructive given that the

portions of the Voting Rights Act at issue applied only to specific areas of the

country where race-based voting discrimination had been especially prevalent.

*City of Boerne*, 521 U.S. at 530–33.[1]  Such geographic tailoring—backed by

reliable congressional findings—provided congruence and proportionality to the

injury at stake.  *Id.*

RFRA, by contrast, applied nationwide and placed "substantial costs" on

the states, "both in practical terms of imposing a heavy litigation burden on the

States and in terms of curtailing their traditional general regulatory power."  *Id.* at

534.  "Laws valid under *Smith* would fall under RFRA without regard to whether

they had the object of stifling or punishing free exercise."  *Id.*  RFRA therefore

exceeded Congress's Fourteenth Amendment, Section 5 powers.

*City of Boerne* nowhere mentions the Tenth Amendment, the Thirteenth

Amendment, or *Jones*.  It does, however, note the Reconstruction-Era Congress's

---

[1]  *Cf.* Gerhard Casper, Jones v. Mayer: *Clio, Bemused and Confused Muse*, 1968 Sup. Ct. L. Rev. 89, 101, 121–22 (criticizing *Jones v. Alfred H. Mayer Co.* for failing to address evidence that Congress may have intended the 1866 Civil Rights Act to apply only in the South).

-20-

concern with ensuring that the Fourteenth Amendment did not grant general police power to the national government. *Id.* at 520–24.

Similar concerns underlay two Commerce Clause cases on which Hatch also relies, *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000). In *Lopez*, the Supreme Court addressed Congress's power under the Commerce Clause to enact the Gun-Free School Zones Act. The act "neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession [of a gun in school zone] be connected in any way to interstate commerce." *Lopez*, 514 U.S. at 551. The Court therefore struck it down as an impermissible attempt to exercise "general federal police power." *Id.* at 564.

In *Morrison*, the Supreme Court struck down a portion of the Violence Against Women Act (VAWA) for similar reasons. VAWA provided a federal civil remedy to victims of "violence motivated by gender." *Morrison*, 529 U.S. at 605 (internal quotation marks omitted). This remedy, although civil in nature, "cover[ed] a wide swath of criminal conduct." *Id.* at 606. In enacting VAWA, Congress found that gender-motivated violence affected interstate commerce indirectly, but the Supreme Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local." *Id.* at 617–18. "Indeed,"

the Court continued, "we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Id*. at 618. The Court accordingly concluded that VAWA's civil remedy exceeded Congress's powers under the Commerce Clause.[2]

Hatch believes that the *Jones* approach to the Thirteenth Amendment undermines the principles animating *City of Boerne*, *Lopez*, and *Morrison*—or in other words, that *Jones* creates a constitutional loophole through which Congress can enact all sorts of otherwise impermissible police power legislation. For example, says Hatch, if all Congress must do is rationally determine that something is a badge or incident of slavery, then it "would permit the federal government . . . to combat such ills as racial profiling, racial bias of jurors, and race discrimination in imposition of the death penalty," Aplt. Br. at 29, or take control of education and family life "given the deprivations of education and familial rights that characterized slavery," Reply Br. at 3.

At its core, Hatch's argument raises important concerns we share. "Badges and incidents of slavery," taken at face value, puts emphasis solely on the conduct Congress seeks to prohibit, and it seems to place few limits on what that conduct

_____

[2] The Court also held that Section 5 of the Fourteenth Amendment did not give Congress power to enact VAWA's civil remedy because Congress sought to regulate private conduct, not state action, and because Congress had not shown geographic "congruence and proportionality." *Id*. at 625–27.

might be.  Given slaves' intensely deplorable treatment and slavery's lasting effects, nearly every hurtful thing one human could do to another and nearly every disadvantaged state of being might be analogized to slavery—and thereby labeled a badge or incident of slavery under *Jones*'s rational determination test. In effect, this interpretation gives Congress the power to define the meaning of the Constitution—a rare power indeed.  *See City of Boerne*, 521 U.S. at 529.  And many legal scholars have encouraged broad use of Section 2 power in essentially this way,[3] which would arguably raise the sort of federalism concerns articulated in *City of Boerne*, *Lopez*, and *Morrison*.  Others have argued for a narrower interpretation that relates more directly to slavery as an institution rather than to any individual feature of slavery.[4]

---

[3] *See, e.g.*, Douglas L. Colbert, *Liberating the Thirteenth Amendment*, 30 Harv. C.R.-C.L. L. Rev. 1, 49 (1995) ("a growing number of legal academics and law students are acknowledging the Thirteenth Amendment's usefulness in addressing many of today's critical race and human rights issues"); *id*. at 47–49 (proposing the Thirteenth Amendment as a means to combat racial disparity in capital sentencing); Pamela D. Bridgewater, *Reproductive Freedom as Civil Freedom: The Thirteenth Amendment's Role in the Struggle for Reproductive Rights*, 3 J. Gender Race & Just. 401, 409–10 (2000) (arguing that "the history of reproductive abuse during the American slavery era" brings reproductive rights generally within the Thirteenth Amendment's ambit); Akhil Reed Amar & Daniel Widawsky, *Child Abuse As Slavery: A Thirteenth Amendment Response to* DeShaney, 105 Harv. L. Rev. 1359, 1364–65 (1992) (reasoning that an abusive parent creates master-slave relationship toward the child, obligating the state to intervene and making it liable for failure to do so).

[4] *See, e.g.*, McAward, *Defining the Badges*, at 621–29 (proposing that "badges and incidents" should be limited to race-motivated public or widespread private conduct that resembles the institution of slavery and is likely to reimpose

(continued...)

While this debate raises worthwhile questions, the Supreme Court has never

revisited the rational determination test it established in *Jones*. And more

importantly for our purposes, none of the federalism authorities Hatch cites

mention *Jones* or the Thirteenth Amendment.[5] Thus, even if we assume Hatch's

authorities impliedly undermine *Jones*'s approach to the Thirteenth Amendment,

we may not blaze a new constitutional trail simply on that basis: "If a precedent

of [the Supreme] Court has direct application in a case"—such as *Jones* has to

this case—"yet appears to rest on reasons rejected in some other line of decisions,

the Court of Appeals should follow the case which directly controls, leaving to

[the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez*

*de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *see also*

*Thomas More Law Ctr. v. Obama*, 651 F.3d 529, 559 (6th Cir. 2011) (Sutton, J.,

concurring) ("[T]he Supreme Court has considerable discretion in resolving

[novel constitutional questions]. [That] does not free lower court judges from the

duty to respect the language and direction of the Court's precedents . . . .").

---

[4](...continued)
de facto slavery); *see also* George Rutherglen, *State Action, Private Action, and the Thirteenth Amendment*, 94 Va. L. Rev. 1367, 1403 (2008) (characterizing "whether the Thirteenth Amendment prohibits practices that do not closely resemble traditional forms of slavery" as "the right question" when attempting to discern the scope of Congress's badges-and-incidents authority) ("Rutherglen, *State Action*").

[5] *See also* McAward, *Enforcement Power*, at 81 ("In light of *City of Boerne*, *Jones* is arguably a remnant of the past. However, the [Supreme] Court itself has never explicitly questioned the *Jones* standard . . . .").

Thus, we must leave it to the Supreme Court to bring Thirteenth Amendment jurisprudence in line with the structural concerns that prompted the limits announced in *City of Boerne*, *Lopez*, and *Morrison.*

### 2. Internal Limitations Within 18 U.S.C. § 249(a)(1)

Further, even under *Jones* we see limiting principles to congressional authority, and the racial violence provision respects those limits.

Although "badges and incidents of slavery" could be interpreted as giving Congress authority to legislate regarding nearly every social ill (because nearly all can be analogized to slavery or servitude), the racial violence provision does not take such an approach. Rather, the racial violence provision focuses on three connected considerations: (1) the salient characteristic of the victim, (2) the state of mind of the person subjecting the victim to some prohibited conduct, and (3) the prohibited conduct itself. Each consideration receives attention in the racial violence provision and leads us to conclude that Congress met the *Jones* test in rationally determining racially motivated violence to be a badge or incident of slavery that it could prohibit under its Section 2 authority.

First, concerning the salient characteristic of the victim—"race, color, religion, or national origin"—Congress confined the racial violence provision's reach to aspects of race as understood in the 1860s when the Thirteenth Amendment was adopted. As to religion and national origin specifically, Congress found that "members of certain religious and national origin groups

-25-

were . . . perceived to be distinct 'races'" in the 1860s and therefore sought to protect these categories "at least to the extent such religions or national origins were regarded as races" in the 1860s. 18 U.S.C. § 249 note (reprinting Pub. L. No. 111-84, § 4702(8)). Supreme Court precedent supports this finding. *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (noting that Congress of the 1860s and '70s often used "race" to refer to distinctions we would likely now think of as matters of national origin or religion rather than race); *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987) (same).

Congress made no similar findings for "color," but there is no reasonable dispute that "color" has long been used as a synonym for "race," particularly with respect to African Americans.

By contrast, Congress placed non-racial classifications—gender, sexual orientation, gender identity, and disability—in a separate paragraph and explicitly linked those classifications to the Commerce Clause or Congress's power over federal territories. *See* 18 U.S.C. § 249(a)(2). Congress likewise repeated the protection for "religion" and "national origin" in that paragraph, presumably to cover circumstances in which a particular religion or national origin was not perceived as a distinct race in the 1860s.

Accordingly, Congress chose to extend the racial violence provision only to persons who embody a trait that equates to "race" as that term was understood in the 1860s.

The second aspect of badges-and-incidents on display in the racial violence provision is the state of mind of the person subjecting the victim to some prohibited conduct. This further confines the statute's reach. Congress did not seek to punish all violence against those who embody a trait that equates to "race." Rather, Congress seeks to punish only those who act "*because of* the [victim's] actual or perceived race." 18 U.S.C. § 249(a)(1) (emphasis added). That is exactly what happened in this case.

The third aspect of badges-and-incidents—the prohibited conduct itself—requires little discussion in light of the foregoing. Congress could rationally conclude that physically attacking a person of a particular race because of animus toward or a desire to assert superiority over that race is a badge or incident of slavery. The antebellum North Carolina Supreme Court, for example, characterized unrestrained master-on-slave violence as one of slavery's most necessary features. *State v. Mann*, 13 N.C. (2 Dev.) 263, 1829 WL 252, at *2–3. "[U]ncontrolled authority over the body," it said, is the only thing "which can operate to produce" a slave's necessary obedience. *Id.* at *2. "The power of the master must be absolute, to render the submission of the slave perfect." *Id.*; *see also United States v. Nelson*, 277 F.3d 164, 189 (2d Cir. 2002) ("slavery in general . . . centrally involves the master's constant power to use private violence against the slave"); *Neal v. Farmer*, 9 Ga. 555, 1851 WL 1474, at *8 (stating that being "liable to beating . . . and every species of chastisement" were "incidents of

-27-

slavery"); George M. Stroud, *A Sketch of the Laws Relating to Slavery* 31, 38 (2d ed. 1856) (listing among the "incidents" of slavery, "[t]he master may, at his discretion, inflict any punishment on the person of his slave"); Rutherglen, *State Action*, at 1399 ("the principal feature of the law of slavery was the 'master's justice' over his slaves, who had virtually no legal protection from the master's decision to discipline and punish"). Just as master-on-slave violence was intended to enforce the social and racial superiority of the attacker and the relative powerlessness of the victim, Congress could conceive that modern racially motivated violence communicates to the victim that he or she must remain in a subservient position, unworthy of the decency afforded to other races.

In sum, Congress employed a limited approach to badges-and-incidents, applying that concept to: (a) actions that can rationally be considered to resemble an incident of slavery when (b) committed upon a victim who embodies a trait that equates to "race" as that term was understood in the 1860s, and (c) motivated by animus toward persons with that trait. While Congress's three-faceted approach is nowhere clearly spelled out in case law, and we therefore have no occasion to decide whether legislation enacted under Section 2 of the Thirteenth Amendment must conform to this approach, we have no trouble endorsing this approach as a means to rationally determine the badges and incidents of slavery. While facially broad, the *Jones* formulation supports the narrower approach Congress took in the racial violence provision—and we need not speculate on

whether a broader criminalization of conduct under this rationale would pass constitutional review.

We therefore conclude that Section 2 of the Thirteenth Amendment authorized Congress to enact the racial violence provision of the Hate Crimes Act.

### D. The Certification Requirement

Hatch also challenges the Hate Crimes Act's requirement that the Attorney General certify any prosecution under the Act:

> **(b) Certification requirement—**
>
> **(1) In general.**—No prosecution of any offense described in this subsection[6] may be undertaken by the United States, except under the certification in writing of the Attorney General, or a designee, that—
>
> > **(A)** the State does not have jurisdiction;
> >
> > **(B)** the State has requested that the Federal Government assume jurisdiction;

---

[6] We assume "this subsection" is a drafting mistake and should actually say "this section," *i.e.*, § 249. If taken literally, "this subsection" would refer to itself, *i.e.*, subsection 249(b). But subsection 249(b) does not describe any offense. The literal reading would therefore render it nonsensical. *Cf. United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." (internal quotation marks omitted; alterations incorporated)); *Gilmore v. United States*, 699 A.2d 1130, 1132 (D.C. 1997) (construing a reference to "this subsection" to mean "this section" because the reference would otherwise be circular and meaningless).

**(C)** the verdict or sentence obtained pursuant to State charges left demonstratively unvindicated the Federal interest in eradicating bias-motivated violence; or

**(D)** a prosecution by the United States is in the public interest and necessary to secure substantial justice.

*Id*. § 249(b)(1). In Hatch's case, the government filed a "Notice of Certification" showing that an assistant attorney general certified the prosecution under subparagraph (D).

Hatch contends the certification requirement represents Congress's attempt to insert *City of Boerne*-like congruence and proportionality into the Act. Hatch appears to be saying that, rather than the geographic congruence and proportionality the Supreme Court endorsed in *City of Boerne*, Congress attempted to create congruence and proportionality by limiting prosecutors' discretion to bring hate crimes cases. And this case supposedly proves that such congruence and proportionality is a sham because the federal government indicted Hatch without awaiting the result of his state prosecution. In particular, Hatch argues that the certification prong under which he was indicted—"a prosecution by the United States is in the public interest and necessary to secure substantial justice"—imposes no real limits on federal power.

We see no constitutional significance in the certification requirement. Similar certification requirements have existed in Thirteenth Amendment

legislation long before 1997, when the Supreme Court introduced the "congruence and proportionality" standard through *City of Boerne*.

For example, 18 U.S.C. § 245 criminalizes racially motivated violence intended to dissuade the victim from "participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof." *Id.* § 245(b)(2)(B). And it prohibits the government from commencing prosecutions for that offense without Attorney General certification that "a prosecution by the United States is in the public interest and necessary to secure substantial justice." *Id.* § 245(a)(1). This has been the law since 1968. *See id.* (statutory credits).

Similarly, 18 U.S.C. § 247 criminalizes vandalism or destruction of "religious real property because of the race, color, or ethnic characteristics of any individual associated with that religious property." *Id.* § 247(c). The government may not prosecute such an offense "except upon the certification in writing of the Attorney General or his designee that in his judgment a prosecution by the United States is in the public interest and necessary to secure substantial justice." *Id.* § 247(e). Congress enacted § 247(c) in 1996—a year before *City of Boerne*—and the certification requirement (§ 247(e)) has been a part of the statute since 1988, when the statute applied only to offenses affecting interstate or foreign commerce. *See* Pub. L. No. 100-346, § 1, 102 Stat. 644 (1988).

We have found no suggestion that these certification requirements were somehow constitutionally required—or constitutionally deficient given that "public interest" and "substantial justice" are expansive legal concepts. We therefore see no merit in Hatch's argument that the Hate Crimes Act's certification requirement somehow proves the need for congruence and proportionality, or the lack of it in this case.

### E. Equal Protection

Finally, Hatch advances what he characterizes as an equal protection argument. He contends as follows: (1) Section 2 of the Thirteenth Amendment authorizes Congress "to extend protection *only* to members of groups disadvantaged by the legacy of slavery," Aplt. Br. at 52 (emphasis added), so (2) the racial violence provision really protects only certain racial groups, and therefore (3) we must subject it to strict scrutiny because the racial violence provision necessarily makes distinctions on the basis of race. This argument fails for several reasons.

First, the Supreme Court has already stated that the Thirteenth Amendment protects all races, not just those that had been subject to slavery in the United States. As explained in *Hodges*:

> While the inciting cause of the [Thirteenth] Amendment
> was the emancipation of the colored race, yet it is not an
> attempt to commit that race to the care of the nation. It
> is the denunciation of a condition, and not a declaration
> in favor of a particular people. It reaches every race and

> every individual, and if in any respect it commits one race to the nation, it commits every race and every individual thereof. Slavery or involuntary servitude of the Chinese, of the Italian, of the Anglo-Saxon, are as much within its compass as slavery or involuntary servitude of the African.

203 U.S. at 16–17. *Jones* overruled *Hodges* to some extent, *see Jones*, 392 U.S. at 441 n.78, but not on this point. Eight years after *Jones*, the Supreme Court cited this passage from *Hodges* with approval as demonstrating that the Court had "previously ratified the view that Congress is authorized under the Enforcement Clause of the Thirteenth Amendment to legislate in regard to every race and individual." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 288 n.18 (1976) (internal quotation marks omitted).

In any event, Hatch's argument does not raise an equal protection problem. Although the idea of equality before the law is deeply ingrained in our jurisprudence, the legal guarantee of equal protection is not a supraconstitutional principle by which the Constitution itself is judged. If, as Hatch claims, the Thirteenth Amendment limits Congress to protecting formerly enslaved races, then Thirteenth Amendment legislation limited to protecting formerly enslaved races is constitutional because it is the very sort of legislation the Thirteenth Amendment authorizes.[7]

---

[7] Hatch has not challenged the district court's conclusion that whites enslaved Navajos well into the 1800s. *See Beebe*, 807 F. Supp. 2d at 1053–54.

Alternatively, one could argue that the later-enacted Fourteenth Amendment somehow supersedes Congress's supposed Thirteenth Amendment power to enact legislation only to protect formerly enslaved races.[8]  But if that is the case, then we have no problem here because the racial violence provision does not limit its reach to members of formerly enslaved races, but explicitly protects "any person."  Thus, it does not run afoul of equal protection principles.

## III.  Conclusion

The portion of the Hate Crimes Act under which Hatch was charged and convicted—18 U.S.C. § 249(a)(1)—is a lawful exercise of the powers granted to Congress by Section 2 of the Thirteenth Amendment.  We therefore affirm Hatch's conviction.

---

[8]  The Fourteenth Amendment, enacted in 1868, guarantees equal protection, and by its terms it restricts only the states—not the federal government.  But the Supreme Court has construed the Fourteenth Amendment to have inserted an equal protection understanding into the Fifth Amendment's due process clause.  *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 215–18 (1995).