JENNIFER WALKER ELROD,
Circuit Judge, specially concurring:
Under binding precedent, § 249(a)(1) is constitutionally valid. I write separately to express my concern that there is a growing tension between the Supreme Court’s precedent regarding the scope of Congress’s powers under § 2 of the Thirteenth Amendment[1] and the Supreme Court’s subsequent decisions regarding the other Reconstruction Amendments and the Commerce Clause. Our sister circuit noted similar concerns in United States v. Hatch, 722 F.3d 1193 (10th Cir.2013), cert. denied, — U.S. -, 134 S.Ct. 1538, 188 L.Ed.2d 561 (2014). This tension between the case law is even more pronounced in light of the Supreme Court’s decision in Shelby County v. Holder, — U.S. -, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013), which is not discussed in Hatch. In my view, we would benefit from additional guidance from the Supreme Court on how to harmonize these lines of precedent.
I.
As noted in the panel opinion, the Thirteenth, Fourteenth, and Fifteenth Amendments are collectively referred to as the Reconstruction Amendments. All three Amendments were ratified between 1865 and 1870 in the wake of the Civil War. Although each Amendment provides unique powers, they also share “a unity of purpose, when taken in connection with the history of the times, which cannot fail to have an important bearing on any question of doubt concerning their true meaning.” Hatch, 722 F.3d at 1202 (citing Slaughter-House Cases, 83 U.S. 36, 67, 16 Wall. 36, 21 L.Ed. 394 (1872)). That “unity of purpose” was to confront slavery, and the atrocious practices associated with it. See George Rutherglen, State Action, Private Action, and the Thirteenth Amendment, 94 Va. L.Rev. 1367, 1370, 1378 (2008).
The Thirteenth Amendment provides that “neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.” U.S. Const, amend. XIII. The Fourteenth Amendment places limits on the ability of the states to curtail the rights of citizens. U.S. Const, amend. XIV. The Fifteenth Amendment states that “[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous *510 condition of servitude.” U.S. Const, amend. XV, § 1. Using nearly identical language, each Amendment provides Congress with the power to enforce its provisions through appropriate legislation.[2]
Defendants and Amici argue that the nearly identical text in § 2 of the Thirteenth Amendment and § 2 of the Fifteenth Amendment logically indicates that the Supreme Court’s reasoning in Shelby County regarding the Fifteenth Amendment should apply in the Thirteenth Amendment context as well. In Shelby County, the Supreme Court addressed whether § 5 of the Voting Rights Act— which was passed pursuant to Congress’s Fifteenth Amendment powers — continued to satisfy constitutional requirements. Shelby Cnty., 133 S.Ct. at 2619. In overturning § 5’s pre-clearance requirement, the Supreme Court noted that Congress could not rely on “decades-old data and eradicated practices” to justify the requirement. Id. at 2627. As the Supreme Court explained, “the [Voting Rights] Act imposes current burdens and must be justified by current needs.” Id. at 2622 (citing Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 203, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009)). This is especially true in circumstances where the federal statute “authorizes federal intrusion into sensitive areas of state and local policymaking.” Id. (citing Lopez v. Monterey Cnty., 525 U.S. 266, 282, 119 S.Ct. 693, 142 L.Ed.2d 728 (1999)). Given the almost identical language in the Thirteenth and Fifteenth Amendments, Shelby County’s admonition might be applied here as well.
In passing § 249(a)(1), Congress focused on past conditions and did not make any findings that current state laws, or the individuals charged with enforcing them, were failing to adequately protect victims from racially-motivated crimes.[3] Specifically, Congress noted that
[slavery and involuntary servitude were enforced, both prior to and after the *511 adoption of the 13th amendment to the Constitution of the United States, through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry.
Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, Pub.L. No. 111-84, 123 Stat. 2190 (2009), div. E., § 4702 (codified as amended at 18 U.S.C. § 249) (emphasis added). Shelby County suggests that this congressional finding regarding circumstances now more than 100 years old cannot serve as the justification for a current expansion of Congress’s powers under the Thirteenth Amendment. See Shelby Cnty., 133 S.Ct. at 2619 (“Congress did not use the record it compiled to shape a coverage formula grounded in current conditions. It instead reenacted a formula based on 40-year-old facts having no logical relation to the present day.”).
There is no doubt that hate crimes and racial discrimination still exist. There is also no doubt that such crimes are deplorable acts. But the question, following Shelby County, is whether § 249(a)(1) satisfies constitutional requirements in our current society. Because the Shepard-Byrd Act “imposes current burdens,” perhaps, like the Voting Rights Act, it too “must be justified” with congressional findings regarding “current needs.” Shelby Cnty., 133 S.Ct. at 2619 (citing Nw. Austin, 557 U.S. 193, 129 S.Ct. 2504).
II.
As the panel opinion explains, the words “badges” and “incidents” were originally terms of art with specific meanings tied to their historical context. “Incidents” referred to public laws that applied in the antebellum slaveholding states. See McAward, supra at 575. “Badges” generally referred to “indicators, physical or otherwise, of African-Americans’ slave or subordinate status.” Id. at 575. The Supreme Court’s earlier case law likewise took a more limited view of the scope of these terms. See Hodges v. United States, 203 U.S. 1, 14-16, 27 S.Ct. 6, 51 L.Ed. 65 (1906). Then, in Jones v. Alfred H. Mayer Co., the Supreme Court reasoned that “[sjurely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery.” 392 U.S. 409, 440, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).
Jones’s articulation of congressional power under § 2 of the Thirteenth Amendment is thus in tension with the Supreme Court’s discussion of congressional power under the Fourteenth Amendment in City of Boerne v. Flores, 521 U.S. 507, 529, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). As the Supreme Court cautioned in Flores:
If Congress could define its own powers by altering the Fourteenth Amendment’s meaning, no longer would the Constitution be “superior paramount law, unchangeable by ordinary means.” It would be “on a level with ordinary legislative acts, and, like other acts, ... alterable when the legislature shall please to alter it.” Under this approach, it is difficult to conceive of a principle that would limit congressional power.
Id. (quoting Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 177, 2 L.Ed. 60 (1803)). Yet under the expansive interpretation of the Thirteenth Amendment found in Jones, Congress has just such a power to define “badges” and “incidents” of slavery. Under our existing Thirteenth Amendment jurisprudence, it has indeed become difficult to “conceive of a principle that would limit congressional power.” Id. As the Tenth Circuit recently explained in Hatch, “this interpretation gives Congress the power to define the meaning of the Constitution — a rare power indeed.” 722 F.3d at 1204.
*512 Moreover, the plain language of § 249(a)(1) has the power to implicate vast swaths of activities that do not relate to removing the “badges” and “incidents” of slavery as the terms were originally understood. It reaches even racial violence against white persons when those acts are based on race. Cf. Jones, 392 U.S. at 443, 88 S.Ct. 2186; McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 288 n. 18, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); Hatch, 722 F.3d at 1208.
The Supreme Court has cautioned against such expansions of federal law into areas, like police power, that are the historical prerogative of the states. See Shelby Cnty., 133 S.Ct. at 2623; United States v. Morrison, 529 U.S. 598, 661 n. 8, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). As the panel opinion details, the incident began with a racial epithet and a missed-punch. The views and actions of the three Defendants are unarguably reprehensible, and punishable under Texas law.[4] But whether their distasteful actions may be constitutionally punished under federal law is by no means a frivolous question.[5] See Hatch, 722 F.3d at 1201.
As Cannon points out, “[a]s repugnant as ‘hate crimes’ may be, the Constitution does not vest authority in the federal government to prosecute such crimes without a federal nexus. We entrust the prosecution of some of the most heinous crimes, including murders, rapes, arson, and assaults, to our state criminal justice systems. Indeed, at least forty five (45) states have criminal statutes that impose harsher penalties for crimes that are motivated by bias including Texas.” (citing Anti-Defamation League, State Hate Crime Provisions (April 28, 2009)).
III.
In Shelby County, the Supreme Court recognized that federal regulations that implicate areas of traditional state power may have profound impacts on the balance of federalism:
[T]he Constitution provides that all powers not specifically granted to the Federal Government are reserved to the States or citizens. This allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States. But the federal balance is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.
Shelby Cnty., 133 S.Ct. at 2623 (internal citations and quotation marks omitted). Just as “the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections” so too did they intend for the general police powers to lie with the States. See id; see also United States v. Lopez, 514 U.S. 549, 561 n. 3, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (“When Congress criminalizes conduct already denounced as criminal by the States, it effects a ‘change in the sensitive relation between federal and state criminal jurisdiction.’ ” (quoting United States v. Enmons, 410 U.S. 396, 411-12, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973))); Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (“Throughout our history the several *513 States have exercised their police powers to protect the health and safety of their citizens. Because these are primarily, and historically, ... matter[s] of local concern, the States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.” (internal quotation marks and citation omitted)); Morrison, 529 U.S. at 661 n. 8, 120 S.Ct. 1740 (“The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims .... [T]he principle that [t]he Constitution created a Federal Government of limited powers, while reserving a generalized police power to the States, is deeply ingrained in our constitutional history.” (internal quotation marks and citation omitted)).
The Supreme Court has articulated limits to Congress’s power under the Commerce Clause out of concern for balance within our federal system. Thus, in both Lopez, 514 U.S. 549, 115 S.Ct. 1624, and Morrison, 529 U.S. 598, 120 S.Ct. 1740, the Supreme Court recognized that Congress does not have the authority under the Commerce Clause to regulate isolated, local activities without a federal nexus. See Lopez, 514 U.S. at 551, 115 S.Ct. 1624 (striking down the Gun-Free School Zones Act as an impermissible attempt to exercise “general federal police power”); Morrison, 529 U.S. at 605, 120 S.Ct. 1740 (striking down the Violence Against Women Act which provided a federal civil remedy to victims of “violence motivated by gender”); see also Hatch, 722 F.3d at 1203-04. As the Lopez Court explained, “[t]o uphold the Government’s contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States.” Lopez, 514 U.S. at 567, 115 S.Ct. 1624. Although the Supreme Court acknowledged that it had held that Congress’s Commerce Clause powers were broad, it declined to extend them further, because “[t]o do so would require us to conclude that the Constitution’s enumeration of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local.” Id. at 567-68, 115 S.Ct. 1624 (citations omitted).
The breadth of Congress’s power is even more pronounced in this case because Congress did not pass § 249(a)(1) under the Commerce Clause, as it did with § 249(a)(2). In contrast to § 249(a)(2), § 249(a)(1) does not contain a specific requirement that the conduct involve interstate or foreign travel, use a channel, facility or instrumentality of interstate or foreign commerce, or invoke the special maritime or territorial jurisdiction of the United States. Compare 18 U.S.C. § 249(a)(2)(B)(i)(I)-(III) with § 249(a)(1). Unlike the Commerce Clause, the Congress’s power under the Thirteenth Amendment is not limited to interstate activities. Unlike the Fourteenth Amendment, it is not limited to state action. Unlike the Fifteenth Amendment, it does not require Congress to act based on a need grounded in current conditions. Congress’s power under the Thirteenth Amendment is constrained only by the definition of “badges” or “incidents” of slavery. See Jones, 392 U.S. at 440, 88 S.Ct. 2186; see generally Rutherglen, supra at 1367. And under Jones, that definition only a self-imposed limit. *514 Congress’s powers are constrained only by Congress.
IV.
In conclusion, I do not write this special concurrence to suggest that racially motivated crimes of hate are anything other than despicable acts. I write instead to point out the tensions between several lines of the Supreme Court’s constitutional jurisprudence. There is tension between the divergent application of nearly identical language in the Reconstruction Amendments. There is tension between Shelby County’s emphasis on current conditions, and the congressional findings supporting the Shepard-Byrd Act, which are grounded in the past. There is tension between the limits that Flores places on Congress’s ability to define the scope of its powers, and its ability to interpret “badges” and “incidents” under Jones. There is tension between the limits placed on the ability of the federal government to intrude into the states’ police powers under Morrison and Lopez, and its power to do so here.
In this case, the federal law reaches acts between private actors, within the heart of the states’ traditional police powers, without any findings that states currently and consistently fail to adequately address the problem. The federal law does not profess to rely on Congress’s Commerce Clause authority; instead, § 249(a)(1) relies on a constitutional provision where Congress has been given the power to set its own parameters. While such a law is clearly permissible under existing Thirteenth Amendment precedent, there is substantial tension with other lines of recent constitutional jurisprudence. See Hatch, 722 F.3d at 1201 (“While Hatch’s arguments raise important federalism questions, in light of Jones it will be up to the Supreme Court to choose whether to extend its more recent federalism cases to the Thirteenth Amendment.”).

. Section 2 of the Thirteenth Amendment provides Congress with the power to legislate against “badges” and "incidents” of slavery. Section 1 of the Thirteenth Amendment provides Congress with a separate power to prohibit involuntary servitude, which is understood as labor coerced by physical force or restraint. See United States v. Kozminski, 487 U.S. 931, 944-48, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988); Jennifer Mason McAward, Defining the Badges and Incidents of Slavery, 14 U. Pa. J. Const. L. 561, 567 (2012). Only Congress’s power under § 2 of the Thirteenth Amendment is at issue in this case. Neither Defendants nor Amici contest Congress's ability to pass legislation to prevent involuntary servitude.

. Both the Thirteenth and Fifteenth Amendment provide that "Congress shall have power to enforce this article by appropriate legislation." U.S. Const, amend. XIII, § 2; U.S. Const, amend. XV, § 2. The Fourteenth Amendment states that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article.” U.S. Const, amend. XIV, § 5.

. The government pointed out that Congress presented statistics showing that hate crimes continue to take place in modern society. See H.R.Rep. No. 86, pt. 1, 111th Cong., 1st Sess. 5-6 (2009). While it is unfortunately true that hate crimes continue to occur, Congress also noted that such crimes have been in decline during the past ten years. Id. at 43-44. More importantly, Congress did not make any findings to suggest that the states are not adequately addressing this problem. Instead, Congress focused on the then-existing limits on federal hate crimes laws, and mentioned only a few anecdotal instances where state prosecutors did not bring charges under state hate crimes laws, or juries did not convict defendants. Id. at 6-9.
Furthermore, as Defendants and Amici note, the Report's Dissenting Views section stated that, "[ujnfortunately, in their haste to rush this bill through the Committee, the majority has not done any fact finding whatsoever.” Id. at 42. The Dissenting Views section goes on to state that:
There is zero evidence that states are not fully prosecuting violent crimes involving "hate.” Moreover, 45 states and the District of Columbia already have laws punishing hate crimes, and Federal law already punishes violence motivated by race or religion in many contexts.... Of the 5 states with no current hate crime legislation (Georgia, Indiana, Arkansas, South Carolina, and Wyoming), Georgia and Indiana have passed legislation pertaining to hate crimes in recent years, and in both states the legislation has been struck down by the courts.
Id. at 44. In Shelby County the Supreme Court cited similar changes in the congressional findings to explain why Congress had not justified § 5's “extraordinary measures” based on current conditions. See Shelby Cnty., 133 S.Ct. at 2624-28.

. The record here shows that Defendants were charged in Harris County, Texas, with misdemeanor assault under state law, and those charges were dropped only after the government brought federal hate crime charges against Defendants.

. This in no way diminishes the insult and assault that Johnson was made to suffer at the hands of Defendants. As counsel for Cannon readily admits, ”[D]efendants are obnoxious people who hold and openly display offensive opinions about racial inequality.”