# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 24, 2014

No. 12-20514

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CHARLES CANNON; BRIAN KERSTETTER; MICHAEL MCLAUGHLIN,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Texas

Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

A jury convicted Defendants Charles Cannon, Brian Kerstetter, and Michael McLaughlin (collectively "Defendants") of committing a hate crime under the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009 ("Shepard-Byrd Act"), 18 U.S.C. § 249(a)(1), for attacking Yondel Johnson. Congress passed the Shepard-Byrd Act pursuant to its powers under the Thirteenth Amendment, which abolished slavery and involuntary servitude. Defendants appealed, arguing that the Shepard-Byrd Act is unconstitutional. They also argue that the evidence presented at trial was insufficient to prove that they attacked Johnson because of his race. We AFFIRM their convictions because the Supreme Court's Thirteenth Amendment precedent allows Congress

No. 12-20514

to define and regulate the "badges" and "incidents" of slavery so long as their definition is rational, and the Shephard-Byrd Act survives rational basis review, and because there is sufficient evidence in the record from which a reasonable jury could conclude that Defendants caused bodily injury to Johnson because of his race.

## I.

The evidence presented at trial demonstrated the following: Joseph Staggs and McLaughlin were homeless and between jobs when they first met at the Salvation Army on August 9, 2011.  Over the next few days, both men were hired for various odd jobs, including by an African-American contractor.  They frequented several local missions with African-American patrons.  On August 13, 2011, the day of the assault, the two men ate a free dinner together at a service known as Church Under the Bridge.  Staggs and McLaughlin were the only two white men to attend the service; the other participants were all African-American.  When asked at trial whether McLaughlin ever had trouble with any of the individuals at these services, Staggs answered, "Quite the contrary, actually."  After dinner Staggs and McLaughlin bought some wine, finished the bottle, and went in search of more alcohol.  The two men were walking together on the streets of downtown Houston just before midnight when they met Cannon and Kerstetter for the first time.  Cannon and Kerstetter ran towards Staggs and McLaughlin.  Staggs heard either Cannon or Kerstetter say, "See, I told you them [*sic*] are woods."

McLaughlin responded to the comment by lifting up his shirt to show the other men his tattoos, which included a swastika, sig runes, a bald man preparing to stab a head with the Star of David on it, a picture of a klansman standing in flames with a swastika behind him, the motto of a group called the Aryan Circle, and the words "white pride."  Staggs noticed Cannon had tattoos on his face.  He also noticed "little lightning bolts" tattooed on the back of

2

Kerstetter's fingers.

A gang tattoo expert would later testify that "wood" is a term commonly used by members of white-supremacy organizations to describe themselves or other white people. The term is not affiliated with a particular group or organization but more generally signals "pride in the [w]hite race." The expert also testified that the lightning bolts tattoos on Cannon's body are known as "sig runes" or "SS bolts" and refer to the insignia adopted by the Schutzstaffel, or SS—a political and racial organization in Nazi Germany. Cannon and Kerstetter introduced themselves, and the four men shook hands and exchanged names. The three Defendants and Staggs then set off together to find more alcohol. At no point did the men discuss racial minorities, or make any plans to attack anyone.

Johnson, an African-American, was sitting alone at a bus stop, waiting to go home after spending the day with his daughter to celebrate her birthday. Johnson was an amateur heavyweight boxer and former Golden Glove participant. He stood six feet, four inches tall and weighed over 200 pounds. Johnson had just finished talking to his daughter on the phone when he heard and saw the three Defendants and Staggs "coming around the corner with their shirts off, bald heads, loud and rowdy." Johnson later testified that he had not met any of the four men before that night.

According to Johnson, Cannon asked him, "Yo, bro, do you have the time?" At that point Johnson looked up and noticed that Cannon was covered in tattoos. Johnson recognized some of the small lightning bolt tattoos on Cannon as white-supremacist "Nazi" symbols. Johnson testified that he responded, "No." One of the other men then said to Cannon. "Why did you call that ni--er a 'bro'? You ain't supposed to call no ni--er a 'bro.'"

"What did he say?" Johnson responded, to which Cannon answered, "You heard him, 'ni--er.' He called you a 'ni--er,' 'ni--er.'"

No. 12-20514

Johnson testified that the four men surrounded him. He stood up with his back against the pole and put up his guard. Cannon flashed a smile and swung a punch at Johnson. Johnson weaved, dodged the blow, and swung back, hitting Cannon. According to Johnson, all four men jumped in and started punching Johnson. Someone grabbed Johnson by the ankles, and Johnson fell to the ground. One of the men lay on top of Johnson while the others stomped on his head. At some point, the men stopped battering Johnson and walked away.

Staggs, who testified as a government witness, told a slightly different version of the encounter.[1] According to Staggs, he watched from twenty to thirty feet away while McLaughlin and Cannon spoke to Johnson. He could not hear their conversation, and did not hear any of the men use racial slurs. Staggs testified that a few seconds later, Johnson appeared mad, jumped up, and started boxing with Cannon. Johnson was getting the better of Cannon, so McLaughlin grabbed Johnson around the waist to try to pull him off of Cannon. A few moments later Kerstetter, who had been standing with Staggs, ran over and joined the fight. Staggs did not think the fight was very serious and saw no reason to get involved. He testified that "there was only one mad person; and the other guys appeared to be trying to get away." Staggs did not see anyone stomp on Johnson. Instead, he testified that as soon as they succeeded in getting Johnson down on the ground, the three Defendants immediately ran away from him.

Soon after, Johnson pulled himself up. He ran after the four men, and eventually caught up with Staggs. Johnson punched Staggs, and Staggs fell. Johnson turned around, and threw another punch to knock a second member of the group to the ground. The other two men charged at Johnson, and knocked Johnson down for the second time. The two men whom Johnson had punched

---

[1] The government agreed to dismiss the charges against Staggs in exchange for his testimony at trial.

4

to the ground got up and joined the other members of the group. At that point, Lorie Garcia—a witness who passed the scene while she was driving in the car with her husband—testified that she saw four white men surrounding a black man, and that two of them were punching him. She immediately called 911.

Meanwhile, Staggs and the three Defendants had walked away for a second time and left Johnson on the ground. Johnson again pulled himself up and picked up a sandbag. He tried to throw it at the four men, but found that it was too heavy. He dropped it and did not pursue the men. Several police cars quickly arrived at the scene. The first few police cars drove past Johnson. As they did so, Johnson pointed to the direction in which the four men had run off. Another police car then stopped by Johnson to control the scene. Johnson's face was swelling and bleeding heavily. His body was bruised, and he staggered as he walked. The police eventually detained Staggs and the three Defendants. The jury heard live and video deposition testimony from officers that Cannon and McLaughlin were agitated upon being detained and used racial slurs when they were arrested—including the word "ni--er" to refer to responding officers who were African-American.

Defendants were initially charged in Harris County, Texas, with misdemeanor assault. These state law misdemeanor charges were dropped after the prosecution brought federal hate crime charges against Defendants. A federal grand jury in the Southern District of Texas returned a one-count indictment charging Defendants with a violation of § 249(a)(1) of the Shepard-Byrd Act. Specifically, the federal indictment alleged that "while aiding and abetting each other," Defendants "willfully caused bodily injury to [Johnson], who is African-American, because of his actual or perceived race, color, and national origin." McLaughlin and Cannon filed pre-trial motions to dismiss the indictment, arguing that § 249(a)(1) is an invalid exercise of congressional power under the Thirteenth Amendment. The government filed a response in

opposition, and the district court denied Defendants' motions.

Defendants moved for judgments of acquittal at the end of the government's evidence, and again at the close of all evidence. The district court denied both motions. The jury returned a guilty verdict against all three Defendants. Defendants then filed motions for a judgment of acquittal or a new trial, again arguing that § 249(a)(1) was invalid under the Thirteenth Amendment and that the prosecution had not met its burden in proving that they caused bodily injury to Johnson because of his actual or perceived race. The district court denied the motions and entered a final judgment. The district court then sentenced Cannon to thirty-seven months of imprisonment, McLaughlin to thirty months of imprisonment, and Kerstetter to seventy-seven months of imprisonment. The district court also sentenced each Defendant to a three-year term of supervised release and a mandatory special assessment of $100. Defendants timely appealed.

## II.

Defendants challenge the constitutionality of § 249(a)(1) of the Shepard-Byrd Act, arguing that it is not a valid exercise of Congress's power under § 2 of the Thirteenth Amendment. Because we are bound by the Supreme Court's precedent and our prior precedent in this area, we conclude that § 249(a)(1) is valid.

We review the constitutionality of federal statutes *de novo. United States v. Portillo–Munoz*, 643 F.3d 437, 439 (5th Cir. 2011). Defendants do not challenge the constitutionality of the entire Shepard-Byrd Act. Instead, they challenge only § 249(a)(1), which applies to hate crimes motivated by religion national origin, race, or color. It provides:

> Offenses involving actual or perceived race, color, religion, or national origin.—Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or

incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person— (A) shall be imprisoned not more than 10 years, fined in accordance with this title, or both.

18 U.S.C. § 249(a)(1)(A).[2] Section 249(a)(1) is distinct from the second part of the Shepard-Byrd Act, which applies to other categories of hate crimes, and rests on different constitutional sources of congressional authority.[3] Congress passed § 249(a)(2) under § 5 of the Fourteenth Amendment and the Commerce Clause. In contrast, § 249(a)(1) rests solely on Congress's authority under § 2 of the Thirteenth Amendment.[4] Section 1 of the Thirteenth Amendment provides: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. Section 2 states that "Congress shall have power to enforce this article by appropriate legislation." *Id.* § 2.

In order to determine whether § 249(a)(1) is a valid exercise of congressional power under § 2 of the Thirteenth Amendment, we begin by looking at the Supreme Court's Thirteenth Amendment jurisprudence. The Supreme Court decided the *Civil Rights Cases*—five consolidated cases implicating the denial of public accommodations to African-Americans—shortly after the adoption of the Thirteenth Amendment. 109 U.S. 3 (1883). There, the Supreme Court held that Congress could not rely on its enforcement power under § 2 of the Thirteenth Amendment to enact public-accommodation

---

[2] Section 249(a)(1)(B) provides separate penalties if the offense results in death, or involves an attempt to kidnap, kill, or commit aggravated sexual abuse.

[3] *See* 18 U.S.C. § 249(a)(2) (covering perceived religion, national origin, gender, sexual orientation, gender identity, or disability).

[4] Even though Johnson was waiting at a bus station at the time the altercation began neither party argues that this case implicates interstate commerce.

provisions of the Civil Rights Act of 1875. *Id.* Specifically, the Supreme Court reasoned that discrimination in public accommodations had "nothing to do with slavery or involuntary servitude," and therefore fell outside the scope of the Thirteenth Amendment. *Id.* at 24.

Although the Supreme Court found the connection between the denial of public accommodation and slavery too attenuated for purposes of the Thirteenth Amendment, it also stated in dicta that the scope of the Thirteenth Amendment extended beyond abolishing laws or private acts that perpetuated slavery or involuntary servitude in a literal sense. Specifically, the Supreme Court stated:

> It is true that slavery cannot exist without law any more than property in lands and goods can exist without law, and therefore the Thirteenth Amendment may be regarded as nullifying all State laws which establish or uphold slavery. But it has a reflex character also, establishing and decreeing universal civil and political freedom throughout the United States; and it is assumed that the power vested in Congress to enforce the article by appropriate legislation, clothes Congress with power to pass all laws necessary and proper for abolishing *all badges and incidents of slavery* in the United States.

*Id.* at 16 (emphasis added). The Supreme Court did not clearly delineate the scope of "badges" and "incidents" of slavery. Scholars have observed that the Supreme Court interpreted this phrase far more narrowly in the past than it does today. *See, e.g.*, Jack M. Balkin & Sanford Levinson, *The Dangerous Thirteenth Amendment*, 112 Colum. L. Rev. 1459, 1469 (2012) (noting that the term "'badges or incidents of slavery,' a term taken from the 1883 *Civil Rights Cases* . . . had construed Congress's [enforcement] powers [under the Thirteenth Amendment] far more narrowly").

Twenty-three years later in *Hodges v. Unites States*, 203 U.S. 1 (1906), the Supreme Court held that the Thirteenth Amendment did not provide Congress with the power to outlaw private parties' interference with the right to make or enforce a contract based on race. The Supreme Court overturned the convictions

of several white men for threatening and harassing African-American workers at a sawmill. In doing so, the Supreme Court explained that "it was not the intent of the [Thirteenth] Amendment to denounce every act done to an individual which was wrong if done to a free man, and yet justified in a condition of slavery, and to give authority to Congress to enforce such denunciation." *Id.* at 19. Instead, the Supreme Court explained that the meaning of the Thirteen Amendment's grant of authority is "as clear as language can make it. The things denounced are slavery and involuntary servitude, and Congress is given power to enforce that denunciation. All understand by these terms a condition of enforced compulsory service of one to another." *Id.* at 16. The Supreme Court refused to extend its interpretation of congressional power beyond that point, explaining that

> prior to the three post bellum amendments to the Constitution the national government had no jurisdiction over a wrong like that charged in this indictment is conceded; that the 14th and 15th Amendments do not justify the legislation is also beyond dispute, for they, as repeatedly held, are restrictions upon state action, and no action on the part of the state is complained of. Unless, therefore, the 13th Amendment vests in the nation the jurisdiction claimed, the remedy must be sought through state action and in state tribunals . . . . Notwithstanding the adoption of these three amendments, the national government still remains one of enumerated powers . . . . True, the 13th Amendment grants certain specified and additional power to Congress, but any congressional legislation directed against individual action which was not warranted before the 13th Amendment must find authority in it.

*Id.* at 14–16.

This interpretation changed in 1968. In *Jones v. Alfred H. Mayer Co.,* the Supreme Court adopted a broader view of the terms "badges" and "incidents" of slavery under the Thirteenth Amendment. 392 U.S. 409 (1968). All parties agree that *Jones* is the logical starting point for our constitutional analysis in this case. In *Jones,* the owners of a suburban St. Louis subdivision refused to

sell a home to a potential buyer solely because he was African-American. *Id.* at 412. Jones filed suit under 42 U.S.C. § 1982, which provides, "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. The seller argued that § 1982 was unconstitutional to the extent that it applied to purely private conduct, rather than to state action. 392 U.S. at 429–36. The Supreme Court disagreed, concluding that Congress had the authority under § 2 of the Thirteenth Amendment to enact the law. *Id.* at 413. Specifically, the Supreme Court held that the scope of Congress's Thirteenth Amendment enforcement power was not limited to measures intended to end structures of slavery in a literal or a formal sense. Instead, the Supreme Court held that Congress has the authority to enact legislation necessary to abolish the "badges" and "incidents" of slavery, as well as the power to rationally determine what those "badges" and "incidents" are. *Id.* at 440–44. The Supreme Court explained that courts should only invalidate legislation enacted under the Thirteenth Amendment if they conclude that Congress made an irrational determination in deciding what constitutes "badges" and "incidents" of slavery in passing legislation to address them. *See id.* at 439–43.

We applied the Supreme Court's approach in *United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115 (5th Cir. 1973). In *Bob Lawrence Realty*, our court concluded that § 3604(e) of the Fair Housing Act fell "within the constitutional authority of Congress to enact legislation to enforce the Thirteenth Amendment." *Id.* at 117. As we explained,

> We think that the mandate of *Jones* is clear. This Court will give great deference, as indeed it must, to the congressional determination that § 3604(e) will effectuate the purpose of the Thirteenth Amendment by aiding in the elimination of the "badges and incidents of slavery in the United States." *Jones v. Mayer Co.,*

No. 12-20514

*supra*, 392 U.S. at 439 . . . . Appellants have failed to present any argument that impugns the reasonableness of the congressional determination. Indeed, no such argument can be made in light of the role that blockbusting plays in creating and in perpetuating segregated housing patterns and thus in preventing ". . . a dollar in the hands of a Negro . . . [from purchasing] the same thing as a dollar in the hands of a white man." *Jones v. Mayer Co.*, *supra*, 392 U.S. at 443; *see also*, Note, *Discriminatory Housing Markets, Racial Unconscionability, and Section 1988: The 'Contract Buyers League' Case*, 80 Yale L. J. 516 (1971). We find that the Thirteenth Amendment empowers Congress to enact § 3604(e).

*Id.* at 120–21.

In enacting the Shepard-Byrd Act, Congress set forth ten findings to provide a basis for the Act in its entirety, including an explicit finding that "eliminating racially motivated violence is an important means of eliminating, to the extent possible, the *badges, incidents, and relics of slavery and involuntary servitude*." Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, Pub. L. No. 111-84, 123 Stat. 2190 (2009), div. E., § 4702 (codified as amended at 18 U.S.C. § 249) (emphasis added).[5] Congress also

---

[5] The other relevant Congressional Findings include the following:

(1) The incidence of violence motivated by the actual or perceived race, color . . . of the victim poses a serious national problem.

. . .

(7) For generations, the institutions of slavery and involuntary servitude were defined by the race, color, and ancestry of those held in bondage. Slavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment to the Constitution of the United States, through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry. Accordingly, eliminating racially motivated violence is an important means of eliminating, to the extent possible, the *badges, incidents, and relics of slavery and involuntary servitude*.

(8) Both at the time when the 13th, 14th, and 15th amendments to the Constitution of the United States were adopted, and continuing to date, members of certain religious and national origin groups were and are perceived to be distinct "races". Thus, in order to eliminate, to the extent possible, the badges, incidents, and relics of slavery, it is necessary to prohibit assaults on the basis of real or perceived religions or national origins, at least to the extent

compiled statistics regarding the prevalence of hate crimes in American society and the need for expanded federal jurisdiction over the problem. *See* H.R. Rep. No. 111-86, Pt. 1, at 5–6 (2009). Both the Supreme Court and our own precedent afford Congress ample deference in defining what private actions qualify as "badges" and "incidents" of slavery. *See Jones*, 392 U.S. at 440; *Bob Lawrence Realty, Inc.*, 474 F.2d at 120. Under our Thirteenth Amendment jurisprudence, we must respect Congress's determination unless it lacks a rational basis.

In order to determine whether racially motivated violence is rationally considered one of the "badges" or "incidents" of slavery, we must first examine what those terms mean. The words "badges" and "incidents" were originally terms of art with specific meanings tied to their historical context.

> An incident of slavery, as that term was used, was any legal right or restriction that necessarily accompanied the institution of slavery. Most often, "incident" was used to refer to the aspects of property law that applied to the ownership and transfer of slaves. It also was used to refer to the civil disabilities imposed on slaves by virtue of their status as property. In all, the term has clear, finite, historically determined meaning. It refers to a closed set of public laws that applied in the antebellum slaveholding states. Identifying an "incident of slavery," then, is an exercise in historical inquiry.

Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery*, 14 U. Pa. J. Const. L. 561, 575 (2012).

While the definition of badge has broadened over time, "in its most general sense, the term 'badge of slavery' . . . refers to indicators, physical or otherwise, of African-Americans' slave or subordinate status." *Id.* at 575. Before the Civil War, the term referred to skin color. After the War, it came to mean the kinds

---

such religions or national origins were regarded as races at the time of the adoption of the 13th, 14th, and 15th amendments to the Constitution of the United States.

Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, Pub. L. No. 111-84, 123 Stat. 2190 (2009), div. E., § 4702 (codified as amended at 18 U.S.C. § 249) (emphasis added).

of legal restrictions, such as the Black Codes, that were imposed on African-Americans to try to enforce inferior status on them. After the end of Black Codes, it came to mean "less formal but equally virulent means—including widespread violence and discrimination, disparate enforcement of racially neutral laws, and eventually, Jim Crow laws—to keep the freed slaves in an inferior status." *Id.* at 581–82.[6]

As the Tenth Circuit explained in its opinion holding that § 249(a)(1) is a valid exercise of Congress's power under § 2 of the Thirteenth Amendment:

> Congress could rationally conclude that physically attacking a person of a particular race because of animus toward or a desire to assert superiority over that race is a badge or incident of slavery. The antebellum North Carolina Supreme Court, for example, characterized unrestrained master-on-slave violence as one of slavery's most necessary features. *State v. Mann*, 13 N.C. (2 Dev.) 263, 1829 WL 252, at *2–3. "[U]ncontrolled authority over the body," it said, is the only thing "which can operate to produce" a slave's necessary obedience. *Id.* at *2. "The power of the master must be absolute, to render the submission of the slave perfect." *Id.*; *see also United States v. Nelson*, 277 F.3d 164, 189 (2d Cir. 2002) ("slavery in general . . . centrally involved the master's constant power to use private violence against the slave"); *Neal v. Farmer*, 9

---

[6] Although there may be concern with the scope of Congress's power under § 2 of the Thirteenth Amendment, none of these definitions suggests that Congress can alter and expand the meaning of these terms to also cover any racially motivated activities that it wants to regulate.

As one commentator explains,

> The concept of the "badges and incidents of slavery" is meant to assist Congress in identifying ways in which it can fulfill that promise and, at the same time, to mark the outer boundaries of the Section 2 power. Indeed, the terms "badge" and "incident" are terms of art that refer to specific aspects of the slave system and its legacy. To suggest that Section 2 of the Thirteenth Amendment confers on Congress a broad power to legislate against discrimination generally overlooks this precise terminology and tends to devalue the immediate aftermath of the slave system, in which governments and individuals alike sought to achieve the de facto reenslavement of four million African Americans.

McAward, *supra*, at 566.

No. 12-20514

Ga. 555, 1851 WL 1474, at \*8 (stating that being "liable to beating . . . and every species of chastisement" were "incidents of slavery"); George M. Stroud, *A Sketch of the Laws Relating to Slavery* 31, 38 (2d ed. 1856) (listing among the "incidents" of slavery, "[t]he master may, at his discretion, inflict any punishment on the person of his slave"); Rutherglen, *State Action*, at 1399 ("the principal feature of the law of slavery was the 'master's justice' over his slaves, who had virtually no legal protection from the master's decision to discipline and punish"). Just as master-on-slave violence was intended to enforce the social and racial superiority of the attacker and the relative powerlessness of the victim, Congress could conceive that modern racially motivated violence communicates to the victim that he or she must remain in a subservient position, unworthy of the decency afforded to other races.

*United States v. Hatch*, 722 F.3d 1193, 1206 (10th Cir. 2013), *cert. denied*, 13-6765, 2014 WL 1124872 (Mar. 24, 2014).

In conclusion, racially motivated violence was essential to the enslavement of African-Americans and was widely employed after the Civil War in an attempt to return African-Americans to a position of de facto enslavement. In light of these facts, we cannot say that Congress was irrational in determining that racially motivated violence is a badge or incident of slavery.

Defendants argue that subsequent Supreme Court decisions related to the Fourteenth and Fifteenth Amendments cast doubts on the continued viability of *Jones*, or show that *Jones* should be limited. Defendants assertions are not frivolous, as our sister circuit noted when addressing many of these same arguments. *See Hatch*, 722 F.3d at 1201–05 (discussing the defendant's federalism arguments and noting that "[a]t its core, Hatch's argument raises important concerns we share").[7] Defendants argue that *Jones* gives Congress a

---

[7] The only two circuits to address this issue have both determined that § 249(a)(1) is a valid exercise of congressional authority. *See United States v. Maybee*, 687 F.3d 1026 (8th Cir. 2012); *Hatch*, 722 F.3d at 1209. In *Hatch*, the Tenth Circuit offers an extensive discussion of the possibly implications of the Supreme Court's subsequent decisions on other constitutional issues. *See Hatch*, 722 F.3d at 1201–05. In *Maybee* the Eighth Circuit noted that

14

No. 12-20514

unique ability to define the scope of its own powers under § 2 of the Thirteenth Amendment. In *Jones*, the Supreme Court explained that "[s]urely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery." *Id.* at 440; *see also Hatch*, 722 F.3d at 1200 ("In sum, after these cases the Thirteenth Amendment can be seen as treating most forms of racial discrimination as badges and incidents of slavery, and that Congress not only has the power to enforce the amendment, but also to a certain extent to define its meaning.").

Defendants and Amici[8] argue that allowing Congress to define the scope of its own authority is an extraordinary measure that appears to be at odds with the Supreme Court's Fourteenth Amendment precedent. Defendants and Amici point to the textual similarities between § 2 of the Thirteenth Amendment and § 5 of the Fourteenth Amendment, arguing that the Supreme Court would apply the "congruence and proportionality" test announced in *City of Boerne v. Flores*, 521 U.S. 507 (1997), and its progeny to the Thirteenth Amendment's § 2.[9] As the

---

> Maybee raises a single and quite narrow challenge to the constitutionality of § 249(a)(1) . . . that the willful infliction of the injury be motivated both by the victim's race and by the victim's enjoyment of a public benefit—in finding a sufficient basis to uphold § 245(b)(2)(B), these cases held that both elements are necessary to justify the exercise of Congress's Thirteenth Amendment enforcement power.

687 F.3d at 1031. The Eighth Circuit then explained that "Maybee provides no reason why a finding of constitutional sufficiency of a statute based on two elements establishes a precedent that both elements are necessary to avoid constitutional infirmity." *Id.* Given this narrow challenge, the Eight Circuit's decision in *Maybee* does not provide as thorough of an analysis of the possible constitutional issues with § 249(a)(1) as the Tenth Circuit does.

[8] Todd Gaziano, Gail Heriot, and Peter Kirsanow ("Amici") are three members of the eight-member U.S. Commission on Civil Rights, a federal commission charged with the responsibility of advising the President, Congress, and the American people on issues of civil rights. Amici filed briefing solely in their capacities as private citizens and not as Commission representatives.

[9] The petitioner and Amici raised many of these same arguments in their petitions for *certiorai* in *Hatch*.

15

Supreme Court explained in *Flores*:

> Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."

521 U.S. at 519. The Supreme Court further warned that

> If Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be "superior paramount law, unchangeable by ordinary means." It would be "on a level with ordinary legislative acts, and, like other acts, . . . alterable when the legislature shall please to alter it." Under this approach, it is difficult to conceive of a principle that would limit congressional power.

*Id.* at 529 (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).

Defendants and Amici argue that under the interpretation of the Thirteenth Amendment found in *Jones*, Congress has just such a power to alter the Thirteenth Amendment's meaning because it can define "badges" and "incidents" of slavery. Defendants argue that under the Supreme Court's existing Thirteenth Amendment jurisprudence, it has become difficult to "conceive of a principle that would limit congressional power." *Id.* As the Tenth Circuit explained in *Hatch*:

> Badges and incidents of slavery, taken at face value, puts emphasis solely on the conduct Congress seeks to prohibit, and it seems to place few limits on what that conduct might be. Given slaves' intensely deplorable treatment and slavery's lasting effects, nearly every hurtful thing one human could do to another and nearly every disadvantaged state of being might be analogized to slavery—and thereby labeled a badge or incident of slavery under *Jones's* rational determination test. In effect, this interpretation gives Congress the power to define the meaning of the Constitution—a rare power indeed.

722 F.3d at 1204. Amici further argue that this judicial deference to Congress's interpretation of the scope of its power is at odds with the principle set forth in

No. 12-20514

*McCulloch v. Maryland*, 17 U.S. 316, 421 (1819), which requires deference to the *means* that Congress uses to achieve a particular end, but not to Congress's determination that the end itself is legitimate.[10]

Defendants and Amici point to the textual similarities between § 2 of the Thirteenth Amendment and § 5 of the Fourteenth Amendment, arguing that the Supreme Court would apply the "congruence and proportionality" test announced in *Flores*, and its progeny to the Thirteenth Amendment's § 2.[11] They argue that § 249(a)(1) cannot pass that test because the law's "sweeping coverage" encompasses a number of crimes that have long been the exclusive domain of the states.

Defendants and Amici also argue that this expansive reading of congressional power under the Thirteenth Amendment is no longer appropriate in light of the Supreme Court's recent decision in *Shelby County. v. Holder*, 133 S. Ct. 2612, 2623 (2013).[12]  In *Shelby County* the Supreme Court invalidated § 4(b) of the Voting Rights Act,  which prescribed a formula for identifying the jurisdictions covered by § 5's preclearance requirement.  *See* 42 U.S.C. 1973c & 1973b(b).  The Supreme Court addressed the scope of Congress's power under § 2 of the Fifteenth Amendment to pass "appropriate legislation" enforcing that Amendment's protections on the right to vote, and explained that Congress must

---

[10] Amici also argue that *Jones* was part of a trio of cases including *Katzenbach v. Morgan*, 384 U.S. 641(1966) (discussing the Fourteenth Amendment) and *South Carolina v. Katzenbach*, 383 U.S. 301(1966)(discussing the Fifteenth Amendment) that gave considerable deference to Congress when it exercises its powers under the Reconstruction Amendments. Amici argue that the Supreme Court has since cut back on the deference given to Congress in *Flores*, 521 U.S. 507, and that the approach used in *Flores* should be applied in this case.

[11] The Thirteenth, Fourteenth, and Fifteenth Amendments are collectively known as the Reconstruction Amendments.

[12] The Tenth Circuit decided *Hatch* only a few days after the Supreme Court's decision in *Shelby County*; *Hatch* does not address how *Shelby County* impacts the proper interpretation of the scope of § 2 of the Thirteenth Amendment.

justify the Voting Right Act's "extraordinary measures" based on current, rather than past, conditions. *See Shelby Cnty.*, 133 S. Ct. at 2625–31. The Supreme Court then concluded:

> Congress may draft another formula based on current conditions. Such a formula is an initial prerequisite to a determination that exceptional conditions still exist justifying such an extraordinary departure from the traditional course of relations between the States and the Federal Government. Our country has changed, and while any racial discrimination in voting is too much, Congress must ensure that the legislation it passes to remedy that problem speaks to current conditions.

*Id.* at 2631 (internal quotations and citations omitted).

Even if the legal landscape regarding the Reconstruction Amendments has changed in light of *Shelby County* and *Flores*, absent a clear directive from the Supreme Court, we are bound by prior precedents. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). For this same reason, Defendants and Amici's arguments based on *McCulloch* is also foreclosed. As the Tenth Circuit explained in *Hatch*, "even if we assume Hatch's authorities impliedly undermine *Jones*'s approach to the Thirteenth Amendment, we may not blaze a new constitutional trail simply on that basis." *Hatch*, 722 F.3d at 1204. *Shelby County* never mentioned the Thirteenth Amendment or *Jones*—rather, the analysis focused on the Fifteenth Amendment and the Voting Rights Act. *Flores* likewise never mentioned the Thirteenth Amendment or *Jones*, and did not hold that the "congruence and proportionality" standard was applicable beyond the Fourteenth Amendment.[13]

---

[13] Amici argue that even under *Jones*, § 249(a)(1) is still unconstitutional because Congress never purported to address slavery when enacting it. Accordingly to Amici, under

No. 12-20514

We therefore continue to follow the Supreme Court's binding precedent in *Jones*. As explained above, § 249(a)(1) is a valid exercise of congressional power because Congress could rationally determine that racially motivated violence is a badge or incident of slavery.

## III.

Because we conclude that § 249(a)(1) is constitutional, we now turn to the question of whether the evidence presented at trial was sufficient to support Defendants' convictions. We conclude that it was. Section 249(a)(1) lists the essential elements of a hate crime motivated by race or color under the Shepard-Byrd Act. In the context of this case, § 249(a)(1) required Defendants to: (1) willfully cause or attempt to cause; (2) bodily injury to any person; (3) because of their actual or perceived race or color.[14]

Cannon and McLaughlin only challenge the sufficiency-of-the-evidence as to the final element, arguing that there was insufficient proof that they were motivated by Johnson's race or color when inflicting his injuries. Because Cannon and McLaughlin properly preserved their challenges to the sufficiency-

---

*Jones*, legislation passed under § 2 of the Thirteenth Amendment may be "somewhat prophylactic in nature," but its end goal must still be to prevent slavery. In essence, Amici argue that Congress may outlaw badges and incidents of slavery only insofar as those badges and incidents are being used to support the institution or reestablishment of slavery, and not for any other purpose. Amici argue that § 249(a)(1) thus fails under the standard set forth in *Flores*, because its ban is not congruent and proportional to the actual problem of slavery. 521 U.S. at 520.

We do not read *Jones* as narrowly as Amici suggest. In *Jones*, the Supreme Court explained that, pursuant to its powers under the Thirteenth Amendment, Congress can legislate to address not only practices that support the institution of slavery, but also "vestiges of slavery" and "the relic[s] of slavery." 392 U.S. at 441 n.78, 443. Under *Jones*, Congress could rationally determine that racially motivated violence is a "badge" or "incident" of slavery. Section 249(a)(1) is thus a valid exercise of congressional power. In reaching this conclusion, we are in keeping with our two sister circuits who have addressed the constitutional validity of § 249(a)(1). *See Hatch*, 722 F.3d at 1209; *Maybee*, 687 F.3d at 1031.

[14] The parties agree that religion and national origin are not at issue in this case.

19

No. 12-20514

of-the-evidence, we review their claims *de novo*.[15]  *United States v. Grant*, 683

F.3d 639, 642 (5th Cir. 2012).

Our review of the sufficiency-of-the-evidence is "highly deferential to the

verdict." *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002).

> The standard of review for determining whether there was sufficient
> evidence to convict a defendant is whether the evidence, when
> reviewed in the light most favorable to the government with all
> reasonable inferences and credibility choices made in support of a
> conviction, allows a rational fact finder to find every element of the
> offense beyond a reasonable doubt.  The evidence is viewed in the
> light most favorable to the verdict, accepting all credibility choices
> and reasonable inferences made by the trier of fact which tend to
> support the verdict.

*United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997) (internal citations

omitted); *see also United States v. Delgado*, 672 F.3d 320, 329 (5th Cir. 2012) (en

banc). "It is not necessary that the evidence exclude every reasonable hypothesis

of innocence or be wholly inconsistent with every conclusion except that of guilt."

*United States v. Lage*, 183 F.3d 374, 382 (5th Cir. 1999).  However, "a verdict

may not rest on mere suspicion, speculation, or conjecture, or on an overly

attenuated piling of inference on inference." *Delgado*, 672 F.3d at 362 (citations

and internal quotations omitted). "[A]ny conflicts in the evidence must be

resolved in favor of the verdict." *United States v. Duncan*, 919 F.2d 981, 990 (5th

Cir. 1990).

### A.

As a threshold matter, the fact that Johnson, not Cannon, was the first

person to inflict bodily injury on someone else during the fight does not render

the evidence insufficient to support the conviction.  By its own terms, § 249(a)(1)

---

[15] Kerstetter waived this claim, as he did not raise it on appeal.  *See* Fed. R. App. P.
28(a)(9)(A); *see also Sama v. Hannigan*, 669 F.3d 585, 589 (5th Cir. 2012) ("It has long been
the rule in this circuit that any issues not briefed on appeal are waived." (quoting *United
States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000)); *United States v. Herrera*, 313 F.3d
882, 885 (5th Cir. 2002) (en banc).

simply requires a defendant to "*attempt* to cause" or "willfully cause" bodily injury to another. Cannon does not dispute that he threw the first—albeit unsuccessful—punch. That punch was an attempt to cause bodily injury to Johnson, and the jury could rationally conclude that Cannon committed a federal hate crime when he took that first swing. The fact that Johnson continued the fight by following Defendants does not render the evidence insufficient. The jury was free to consider these factors and chose to believe that Defendants had attempted to willfully cause bodily injury to Johnson.

When viewed in the light most favorable to the verdict, a rational trier of fact could have found the essential element of racial motivation beyond a reasonable doubt based on the evidence presented here. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). At trial, Staggs testified that Cannon and Kerstetter met Staggs and McLaughlin for the first time shortly before the fight. Johnson testified that he had never met any of the four men before. The men did not attempt to rob Johnson. There was no evidence of any other communications between Defendants and Johnson that could have instigated the fight other than the repeated use of the word "ni--er." Collectively, these facts could have led a jury to rule out other non-racially motivated reasons for the brawl. When the three Defendants and Staggs first met, Staggs heard either Cannon or Kerstetter say, "See, I told you them [*sic*] are woods." At trial, a gang tattoo expert testified that "wood" is used by members of white-supremacy organizations to describe themselves or other white people. McLaughlin responded to the comment by lifting up his shirt to show the other men his tattoos, which included a swastika, sig runes, a bald man preparing to stab a head with the Star of David on it, a picture of a klansman standing in flames with a swastika behind him, the motto of a white-supremacist group called the Aryan Circle, and the words "white pride." Cannon also had a number of tattoos

associated with white-supremacist views, including sig runes, a German military iron cross, a swastika, the word "wood," and a woodpecker.

Cannon and McLaughlin argue that the evidence presented at trial cannot support a conviction under § 249(a)(1) because there is no proof of premeditation or a plan to attack members of a particular group—in this case, African-Americans. Rather, they were on a mutual quest for beer. Cannon and McLaughlin note that a survey of hate crime cases indicates that the defendants who were found to have a racial animus always have a plan to attack a member of a minority group.[16] *See, e.g.*, *United States v. Allen*, 341 F.3d 870, 875 (9th Cir. 2003) (defendants "patroll[ed]" park with weapons and "moved toward the center of the park looking for racial minorities and Jews"); *Nelson*, 277 F.3d at 170 ("In response to Price's exhortations, many people in the crowd began to yell, 'Get the Jews.'"); *United States v. Bledsoe*, 728 F.2d 1094, 1095 (8th Cir. 1984) (explaining that "appellant and his companions regularly went to Liberty Park to 'harass homosexuals'"). In contrast, Cannon and McLaughlin note that there was no evidence presented at trial to indicate that Defendants and Staggs were looking to attack an African-American, or anyone else, when they set off together. Instead, Staggs testified that they were looking for beer and never discussed African-Americans or any other minority groups before their encounter with Johnson.

We disagree that § 249(a)(1) requires any such showing of premeditation. Although Defendants point to cases from other circuits involving premeditation, none of those courts *required* premeditation or a plan of attack to sustain federal hate crime charges. *See, e.g.*, *Nelson*, 277 F.3d 164; *Bledsoe*, 728 F.2d 1094;

---

[16] These cases deal with another hate crime provision, 18 U.S.C. § 245(b)(2)(B), which requires that the defendant's actions be motivated based on "an animus against the victim on account of her race, religion, etc., that is, her membership in a class or category the statute protects." *United States v. Nelson*, 277 F.3d 164, 194 (2d Cir. 2002). Section 245(b)(2)(B) is not at issue here.

*Allen*, 341 F.3d 870. Evidence of such a plan is no doubt helpful to show that a defendant was racially motivated, but it is not necessary so long as there is other evidence of the defendant's motivation. Imposing a plan or premeditation requirement would conflict with the plain language of § 249(a)(1), which does not include such an element. So long as the jury heard evidence that indicated Defendants had the necessary race-based motivation at the time they inflicted or attempted to inflict bodily injury on Johnson, we cannot say that there was insufficient evidence for the jury to find them guilty under § 249(a)(1).

Cannon and McLaughlin also argue that speech-based evidence showing that Defendants harbored white-supremacist views, such as their tattoos and use of racial epithets, was insufficient to show that the assault was motivated by race. Once again, we must disagree. The Supreme Court has made clear that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). Moreover, our sister circuits who have considered this issue have all allowed speech-based evidence to support a finding that a crime was motivated by racial hatred. *See, e.g.*, *Allen*, 341 F.3d at 885–86 (evidence of racist tattoos and literature, and skinhead paraphernalia such as combat boots and swastika arm-bands were relevant to proving racial animus); *United States v. Magleby*, 241 F.3d 1306, 1318–19 (10th Cir. 2001) (evidence that the defendant listened to CD with racist lyrics was relevant to establishing that the defendant targeted the victims because of their race); *United States v. Woodlee*, 136 F.3d 1399, 1410–11 (10th Cir. 1998) ("Evidence of past racial animosity is relevant" to establishing that defendant acted because of race.); *United States v. Dunnaway*, 88 F.3d 617, 618–19 (8th Cir. 1996) (evidence of defendant's "racist views, behavior, and speech" relevant to establishing element of the crime requiring "discriminatory purpose and intent"); *O'Neal v. Delo*, 44 F.3d 655, 661 (8th Cir. 1995) (defendant's membership in Aryan Brotherhood

relevant to question of whether racial animus was motive for murder); *United States v. Franklin*, 704 F.2d 1183, 1187–88 (10th Cir. 1983) (admitting testimony regarding the defendant's self-identification as a racist and strong dislike of African-Americans and Jews and the mixing of black and white races relevant given that statute requires that the defendant have acted because of race).

Cannon and McLaughlin argue that as repugnant as their views and behavior may have been, the evidence is insufficient to show that their actions were racially motivated because not all Defendants used racial epithets, and their tattoos do not indicate that they were all members of a particular group with white-supremacist views.  Cannon notes that Staggs did not have any tattoos at all.  Cannon and McLaughlin argue that although the symbols in the tattoos are all indicative of groups who believe that whites are superior to other races, the gang expert also testified that not all individuals who have these tattoos are affiliated with a gang or organization.  The expert also testified that members of these different groups do not necessarily share a common set of beliefs.  There was also evidence that Kerstetter tattooed over one of his tattoos, and that individuals sometimes seek to cover up tattoos in this way when they no longer want them on their bodies.

The jury was able to see the markings on the Defendants' bodies and to hear the words that they used in connection with the attack.  Johnson testified that the men called him a "ni--er" multiple times immediately before Cannon threw the first punch and that Cannon "flashed a smile" at him just before taking that first swing.  Given Defendants' use of racial epithets in front of Johnson immediately before the fight, a rational jury could have inferred that this smile demonstrated Cannon's desire to fight, and therefore cause bodily injury to Johnson.  Following the fight, police officer Samuel Thomas testified that he heard Cannon yell the word "ni--er" several times.  Viewed in the light

24

No. 12-20514

most favorable to the verdict there was sufficient evidence from which the jury could infer that Cannon and McLaughlin attacked Johnson "because of" race.[17]

## IV.

For the reasons stated above, we AFFIRM Defendants' convictions.

---

[17] Cannon and McLaughlin also argue that there was no evidence presented that Johnson was African-American, but the jury was able to see Johnson during his testimony, and take his appearance into account when reaching their determination.

No. 12-20514

JENNIFER WALKER ELROD, Circuit Judge, specially concurring:

Under binding precedent, § 249(a)(1) is constitutionally valid. I write separately to express my concern that there is a growing tension between the Supreme Court's precedent regarding the scope of Congress's powers under § 2 of the Thirteenth Amendment[1] and the Supreme Court's subsequent decisions regarding the other Reconstruction Amendments and the Commerce Clause. Our sister circuit noted similar concerns in *United States v. Hatch*, 722 F.3d 1193 (10th Cir. 2013), *cert. denied*, 13-6765, 2014 WL 1124872 (Mar. 24, 2014). This tension between the case law is even more pronounced in light of the Supreme Court's decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), which is not discussed in *Hatch*. In my view, we would benefit from additional guidance from the Supreme Court on how to harmonize these lines of precedent.

I.

As noted in the panel opinion, the Thirteenth, Fourteenth, and Fifteenth Amendments are collectively referred to as the Reconstruction Amendments. All three Amendments were ratified between 1865 and 1870 in the wake of the Civil War. Although each Amendment provides unique powers, they also share "a unity of purpose, when taken in connection with the history of the times, which cannot fail to have an important bearing on any question of doubt concerning their true meaning." *Hatch*, 722 F.3d at 1202 (citing *Slaughter-House Cases*, 83 U.S. 36, 67 (1872)). That "unity of purpose" was to confront slavery, and the atrocious practices associated with it. *See* George Rutherglen, *State Action,*

---

[1] Section 2 of the Thirteenth Amendment provides Congress with the power to legislate against "badges" and "incidents" of slavery. Section 1 of the Thirteenth Amendment provides Congress with a separate power to prohibit involuntary servitude, which is understood as labor coerced by physical force or restraint. *See United States v. Kozminski*, 487 U.S. 931, 944–48 (1988); Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery*, 14 U. Pa. J. Const. L. 561, 567 (2012). Only Congress's power under § 2 of the Thirteenth Amendment is at issue in this case. Neither Defendants nor Amici contest Congress's ability to pass legislation to prevent involuntary servitude.

*Private Action, and the Thirteenth Amendment*, 94 Va. L. Rev. 1367, 1370, 1378 (2008).

The Thirteenth Amendment provides that "neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII. The Fourteenth Amendment places limits on the ability of the states to curtail the rights of citizens. U.S. Const. amend. XIV. The Fifteenth Amendment states that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. Using nearly identical language, each Amendment provides Congress with the power to enforce its provisions through appropriate legislation.[2]

Defendants and Amici argue that the nearly identical text in § 2 of the Thirteenth Amendment and § 2 of the Fifteenth Amendment logically indicates that the Supreme Court's reasoning in *Shelby County* regarding the Fifteenth Amendment should apply in the Thirteenth Amendment context as well. In *Shelby County*, the Supreme Court addressed whether § 5 of the Voting Rights Act—which was passed pursuant to Congress's Fifteenth Amendment powers—continued to satisfy constitutional requirements. *Shelby Cnty.*, 133 S. Ct. at 2619. In overturning § 5's pre-clearance requirement, the Supreme Court noted that Congress could not rely on "decades-old data and eradicated practices" to justify the requirement. *Id.* at 2627. As the Supreme Court explained, "the [Voting Rights] Act imposes current burdens and must be

---

[2] Both the Thirteenth and Fifteenth Amendment provide that "Congress shall have power to enforce this article by appropriate legislation." U.S. Const. amend. XIII, § 2; U.S. Const. amend. XV, § 2. The Fourteenth Amendment states that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5.

justified by current needs." *Id.* at 2622 (citing *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)). This is especially true in circumstances where the federal statute "authorizes federal intrusion into sensitive areas of state and local policymaking." *Id.* (citing *Lopez v. Monterey Cnty.*, 525 U.S. 266, 282 (1999)). Given the almost identical language in the Thirteenth and Fifteenth Amendments, *Shelby County*'s admonition might be applied here as well.

In passing § 249(a)(1), Congress focused on past conditions and did not make any findings that current state laws, or the individuals charged with enforcing them, were failing to adequately protect victims from racially-motivated crimes.[3] Specifically, Congress noted that

> [s]lavery and involuntary servitude *were enforced, both prior to and after the adoption of the 13th amendment* to the Constitution of the

---

[3] The government pointed out that Congress presented statistics showing that hate crimes continue to take place in modern society. *See* H.R. Rep. No. 86, pt. 1, 111th Cong., 1st Sess. 5–6 (2009). While it is unfortunately true that hate crimes continue to occur, Congress also noted that such crimes have been in decline during the past ten years. *Id.* at 43–44. More importantly, Congress did not make any findings to suggest that the states are not adequately addressing this problem. Instead, Congress focused on the then-existing limits on federal hate crimes laws, and mentioned only a few anecdotal instances where state prosecutors did not bring charges under state hate crimes laws, or juries did not convict defendants. *Id.* at 6–9.

Furthermore, as Defendants and Amici note, the Report's Dissenting Views section stated that, "[u]nfortunately, in their haste to rush this bill through the Committee, the majority has not done any fact finding whatsoever." *Id.* at 42. The Dissenting Views section goes on to state that:

> There is zero evidence that states are not fully prosecuting violent crimes involving "hate." Moreover, 45 states and the District of Columbia already have laws punishing hate crimes, and Federal law already punishes violence motivated by race or religion in many contexts. . . . Of the 5 states with no current hate crime legislation (Georgia, Indiana, Arkansas, South Carolina, and Wyoming), Georgia and Indiana have passed legislation pertaining to hate crimes in recent years, and in both states the legislation has been struck down by the courts.

*Id.* at 44. In *Shelby County* the Supreme Court cited similar changes in the congressional findings to explain why Congress had not justified § 5's "extraordinary measures" based on current conditions. *See Shelby Cnty.*, 133 S. Ct. at 2624–28.

No. 12-20514

United States, through widespread public and private violence
directed at persons because of their race, color, or ancestry, or
perceived race, color, or ancestry.

Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, Pub. L. No.
111-84, 123 Stat. 2190 (2009), div. E., § 4702 (codified as amended at 18
U.S.C. § 249) (emphasis added). *Shelby County* suggests that this congressional
finding regarding circumstances now more than 100 years old cannot serve as
the justification for a current expansion of Congress's powers under the
Thirteenth Amendment. *See Shelby Cnty.*, 133 S. Ct. at 2619 ("Congress did not
use the record it compiled to shape a coverage formula grounded in current
conditions. It instead reenacted a formula based on 40–year–old facts having no
logical relation to the present day.").

There is no doubt that hate crimes and racial discrimination still exist.
There is also no doubt that such crimes are deplorable acts. But the question,
following *Shelby County*, is whether § 249(a)(1) satisfies constitutional
requirements in our current society. Because the Shepard-Byrd Act "imposes
current burdens," perhaps, like the Voting Rights Act, it too "must be justified"
with congressional findings regarding "current needs." *Shelby Cnty.,* 133 S. Ct.
at 2619 (citing *Nw. Austin*, 557 U.S. 193).

## II.

As the panel opinion explains, the words "badges" and "incidents" were
originally terms of art with specific meanings tied to their historical context.
"Incidents" referred to public laws that applied in the antebellum slaveholding
states. *See* McAward, *supra* at 575. "Badges" generally referred to "indicators,
physical or otherwise, of African-Americans' slave or subordinate status." *Id.* at
575. The Supreme Court's earlier case law likewise took a more limited view
of the scope of these terms. *See Hodges v. Unites States*, 203 U.S. 1, 14–16

29

(1906). Then, in *Jones v. Alfred H. Mayer Co.,* the Supreme Court reasoned that "[s]urely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery." 392 U.S. 409, 440 (1968).

*Jones*'s articulation of congressional power under § 2 of the Thirteenth Amendment is thus in tension with the Supreme Court's discussion of congressional power under the Fourteenth Amendment in *City of Boerne v. Flores*, 521 U.S. 507, 529 (1997). As the Supreme Court cautioned in *Flores*:

> If Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be "superior paramount law, unchangeable by ordinary means." It would be "on a level with ordinary legislative acts, and, like other acts, . . . alterable when the legislature shall please to alter it." Under this approach, it is difficult to conceive of a principle that would limit congressional power.

*Id.* (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)). Yet under the expansive interpretation of the Thirteenth Amendment found in *Jones*, Congress has just such a power to define "badges" and "incidents" of slavery. Under our existing Thirteenth Amendment jurisprudence, it has indeed become difficult to "conceive of a principle that would limit congressional power." *Id.* As the Tenth Circuit recently explained in *Hatch*, "this interpretation gives Congress the power to define the meaning of the Constitution—a rare power indeed." 722 F.3d at 1204.

Moreover, the plain language of § 249(a)(1) has the power to implicate vast swaths of activities that do not relate to removing the "badges" and "incidents" of slavery as the terms were originally understood. It reaches even racial violence against white persons when those acts are based on race. *Cf. Jones*, 392

No. 12-20514

U.S. at 443; *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 288 n.18 (1976); *Hatch*, 722 F.3d at 1208.

The Supreme Court has cautioned against such expansions of federal law into areas, like police power, that are the historical prerogative of the states. *See Shelby Cnty.*, 133 S. Ct. at 2623; *United States v. Morrison*, 529 U.S. 598, 661 n.8 (2000). As the panel opinion details, the incident began with a racial epithet and a missed-punch. The views and actions of the three Defendants are unarguably reprehensible, and punishable under Texas law.[4] But whether their distasteful actions may be constitutionally punished under federal law is by no means a frivolous question.[5] *See Hatch*, 722 F.3d at 1201.

As Cannon points out, "[a]s repugnant as 'hate crimes' may be, the Constitution does not vest authority in the federal government to prosecute such crimes without a federal nexus. We entrust the prosecution of some of the most heinous crimes, including murders, rapes, arson, and assaults, to our state criminal justice systems. Indeed, at least forty five (45) states have criminal statutes that impose harsher penalties for crimes that are motivated by bias including Texas." (citing Anti-Defamation League, *State Hate Crime Provisions* (April 28, 2009)).

III.

In *Shelby County*, the Supreme Court recognized that federal regulations that implicate areas of traditional state power may have profound impacts on the balance of federalism:

---

[4] The record here shows that Defendants were charged in Harris County, Texas, with misdemeanor assault under state law, and those charges were dropped only after the government brought federal hate crime charges against Defendants.

[5] This in no way diminishes the insult and assault that Johnson was made to suffer at the hands of Defendants. As counsel for Cannon readily admits, "[D]efendants are obnoxious people who hold and openly display offensive opinions about racial inequality."

> [T]he Constitution provides that all powers not specifically granted to the Federal Government are reserved to the States or citizens. This allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States. But the federal balance is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.

*Shelby Cnty.*, 133 S. Ct. at 2623 (internal citations and quotation marks omitted). Just as "the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections" so too did they intend for the general police powers to lie with the States. *See id; see also United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995) ("When Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction.'" (quoting *United States v. Emmons*, 410 U.S. 396, 411–12 (1973))); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are primarily, and historically, . . . matter[s] of local concern, the States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." (internal quotation marks and citation omitted)); *Morrison*, 529 U.S. at 661 n.8 ("The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims. . . . [T]he

principle that [t]he Constitution created a Federal Government of limited powers, while reserving a generalized police power to the States, is deeply ingrained in our constitutional history." (internal quotation marks and citation omitted)).

The Supreme Court has articulated limits to Congress's power under the Commerce Clause out of concern for balance within our federal system.  Thus, in both *Lopez*, 514 U.S. 549, and *Morrison*, 529 U.S. 598, the Supreme Court recognized that Congress does not have the authority under the Commerce Clause to regulate isolated, local activities without a federal nexus.  *See Lopez*, 514 U.S. at 551 (striking down the Gun–Free School Zones Act as an impermissible attempt to exercise "general federal police power"); *Morrison*, 529 U.S. at 605 (striking down the Violence Against Women Act which provided a federal civil remedy to victims of "violence motivated by gender"); *see also Hatch*, 722 F.3d at 1203–04.  As the *Lopez* Court explained, "[t]o uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567.  Although the Supreme Court acknowledged that it had held that Congress's Commerce Clause powers were broad, it declined to extend them further, because "[t]o do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local." *Id.* at 567–68 (citations omitted).

The breadth of Congress's power is even more pronounced in this case because Congress did not pass § 249(a)(1) under the Commerce Clause, as it did with § 249(a)(2).  In contrast to § 249(a)(2), § 249(a)(1) does not contain a specific requirement that the conduct involve interstate or foreign travel, use a channel, facility or instrumentality of interstate or foreign commerce, or invoke the

special maritime or territorial jurisdiction of the United States. *Compare* 18 U.S.C. § 249(a)(2)(B)(i)(I)-(III) *with* § 249(a)(1). Unlike the Commerce Clause, the Congress's power under the Thirteenth Amendment is not limited to interstate activities. Unlike the Fourteenth Amendment, it is not limited to state action. Unlike the Fifteenth Amendment, it does not require Congress to act based on a need grounded in current conditions. Congress's power under the Thirteenth Amendment is constrained only by the definition of "badges" or "incidents" of slavery. *See Jones*, 392 U.S. at 440; *see generally* Rutherglen, *supra* at 1367. And under *Jones*, that definition only a self-imposed limit. Congress's powers are constrained only by Congress.

## IV.

In conclusion, I do not write this special concurrence to suggest that racially motivated crimes of hate are anything other than despicable acts. I write instead to point out the tensions between several lines of the Supreme Court's constitutional jurisprudence. There is tension between the divergent application of nearly identical language in the Reconstruction Amendments. There is tension between *Shelby County*'s emphasis on current conditions, and the congressional findings supporting the Shepard-Byrd Act, which are grounded in the past. There is tension between the limits that *Flores* places on Congress's ability to define the scope of its powers, and its ability to interpret "badges" and "incidents" under *Jones*. There is tension between the limits placed on the ability of the federal government to intrude into the states' police powers under *Morrison* and *Lopez*, and its power to do so here.

In this case, the federal law reaches acts between private actors, within the heart of the states' traditional police powers, without any findings that states currently and consistently fail to adequately address the problem. The federal law does not profess to rely on Congress's Commerce Clause authority;

instead, § 249(a)(1) relies on a constitutional provision where Congress has been given the power to set its own parameters. While such a law is clearly permissible under existing Thirteenth Amendment precedent, there is substantial tension with other lines of recent constitutional jurisprudence. *See Hatch*, 722 F.3d at 1201 ("While Hatch's arguments raise important federalism questions, in light of *Jones* it will be up to the Supreme Court to choose whether to extend its more recent federalism cases to the Thirteenth Amendment.").